No. 03-746

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 53

NINA SCHMIDT,

        Petitioner and Appellant,

    v.

ELVIN LOU COOK and ROBERT COOK
d/b/a TRIPLE CROWN MOTOR INN,

        Defendants and Respondents.


APPEAL FROM:    District Court of the Eighth Judicial District,
                   In and for the County of Cascade, Cause No. ADV 2002-980
                   The Honorable Thomas McKittrick, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Randy Lee Tarum, Attorney at Law, Great Falls, Montana

        For Respondents:

                Robert Cook, *pro se*, Boise, Idaho


                              Submitted on Briefs:  April 13, 2004

                                     Decided:  March 8, 2005


Filed:


                      _____
                                Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Nina Schmidt ("Schmidt") appeals the District Court's Corrected Order Affirming the Human Rights Commission ("HRC"), whose Order Reversing and Dismissing Final Agency Decision ("Order") resulted in the dismissal of her charge of illegal discrimination against Elvin Lou Cook ("Elvin") and Robert Cook ("Robert"), d/b/a Triple Crown Motor Inn ("the Motel"). The HRC concluded that there was not substantial credible evidence to support a finding of discrimination on the basis of sex, and that because any alleged illegal discrimination did not occur in the employment context, the HRC did not have jurisdiction. The District Court affirmed. We reverse and remand.

## ISSUE

¶2 We restate the issue as follows: Did the District Court err when it upheld the HRC's reversal of the Final Agency Decision?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Robert purchased the Motel in August 2000. In September 2000, Robert's brother Elvin became the Motel manager. Elvin had previously worked for Robert in a similar capacity in at least two other motels that Robert had owned. Elvin was authorized to operate the Motel and to hire new staff.

¶4 Elvin advertised for a "Live In Maid." Schmidt's friend Amber Symington ("Symington") worked and lived at the Motel. On September 28, 2000, Schmidt visited Symington and stayed overnight in Symington's room. Schmidt inquired about working at the Motel and Symington introduced her to Elvin.

2

¶5    On September 29, 2000, Elvin interviewed Schmidt for the Motel maid position. He conducted the interview in his Motel room. When Schmidt first arrived, Elvin stripped his bed and asked Schmidt to remake it to demonstrate that she could make a bed. After she did so, Schmidt testified, Elvin informed her that she was hired for the maid position. Elvin then informed Schmidt that as part of her job, she would be required to have sex with him and with Motel customers. He described in detail a variety of sexual acts that Schmidt would be required to perform. He told her that she might eventually make $20,000 to $40,000 per month.

¶6    At the time of the interview, Schmidt was an emancipated sixteen-year-old who was married and separated, and living with her mother, Phyllis Slade ("Slade"). The family lived on Slade's public assistance and Social Security disability payments of $491 per month. Schmidt had an eighth-grade education and had been unable to find work because of her age and lack of work experience. Schmidt considered accepting the Motel job.

¶7    After the interview, Schmidt gave Elvin Slade's phone number. Elvin called Slade, and Schmidt got on the phone and told Slade that she had been hired to be a maid at the Motel. Slade then spoke with Elvin, who informed her that Robert owned the Motel and that he, Elvin, was the manager. Elvin knew that Schmidt was sixteen; he assured Slade that he would make sure she was okay in her new job. The telephone call was interrupted by call-waiting, and Elvin agreed to call Slade back in a few minutes.

¶8    Elvin gave Schmidt and Symington $50 to buy whatever supplies they might need to stay at the Motel. After they left his motel room, Elvin called Slade again and discussed

3

Schmidt's job in more detail. Elvin explained that Schmidt would have to live at the Motel, and that he would personally train Schmidt. Elvin informed Slade that Schmidt's starting salary at the Motel would be $1500 per week. He also stated that he planned to take Schmidt and a few other females who worked at the Motel to work at a motel in Las Vegas, where Schmidt would be able to earn a great deal more money.

¶9 The next day, September 30, Elvin fired Symington and evicted her from the Motel for having a party in her room the night before. Schmidt also left the Motel, but returned later with a friend she had recruited at Elvin's request, to interview as a replacement for Symington. Elvin rejected Schmidt's friend for the job.

¶10 On October 1, 2000, Schmidt informed her mother that the job at the Motel included prostitution. Slade called the police. The Great Falls Police Department was already investigating Elvin and the Motel, because another woman had reported that she interviewed with Elvin and received the same job offer as Schmidt. On October 2, Detective Richard Hollis met with Schmidt and verified that Elvin had offered her a maid position, contingent upon her willingness to engage in sexual acts with Elvin and Motel customers. Schmidt agreed, with her mother's permission, to carry a concealed recording device (a "wire") in her purse and return to the Motel for another meeting with Elvin.

¶11 Schmidt returned to the Motel on October 2, with the wired purse. She engaged Elvin in conversation and he repeated that she would be required to engage in sexual acts with him and with Motel customers as part of her job. He then pulled down her pants and underpants and hit her on her bottom with a ping pong paddle. Schmidt fled Elvin's motel room.

4

¶12 The Great Falls Police Department obtained a warrant and arrested Elvin for felony aggravated promotion of prostitution and misdemeanor sexual assault. He ultimately pled guilty to misdemeanor promotion of prostitution and misdemeanor sexual assault on Schmidt. At his sentencing, he admitted that he hired women at the Motel to give massages, spank customers, and offer specialized sexual services. He apologized to Schmidt and the other women.

¶13 Robert, who resided in Boise, Idaho, found out about Elvin's arrest when a friend sent him a newspaper article about it. Robert had never developed any written policy concerning sexual harassment or *quid pro quo* supervisory practices at the Motel.

¶14 On February 1, 2001, Slade filed complaints on Schmidt's behalf with the Department of Labor and Industry ("Department"). One complaint alleged that Elvin discriminated against Schmidt on the basis of sex by subjecting her to sexual harassment. In the other complaint, she alleged the Motel discriminated against Schmidt on the basis of sex in employment by reason of Elvin's harassment. Amended complaints were filed on March 19, 2001. Upon Schmidt reaching age eighteen, the caption of the case was amended accordingly.

¶15 The Department consolidated the cases and appointed a Hearing Examiner on July 16, 2001. On July 18, 2001, Elvin was personally served with process at the Motel, where he was still working as the manager. Robert Cook was added as an individual respondent on October 10, 2001. Elvin failed to appear and defend. The Hearing Examiner entered a default against him on October 15, 2001. Robert appeared personally on November 5, 2001.

5

¶16    On January 29, 2002, although Elvin had not appeared in the case, he suborned false statements from Slade and from Schmidt's brother, promising them $150,000 and college tuition for Schmidt's brother if they would give written statements and testify that Schmidt was a drug user and that she had propositioned Elvin, offering him sex in exchange for a motel room. The Hearing Examiner held a contested case hearing on January 30 and 31, 2002. On the morning of January 31, 2002, Slade and Schmidt's brother provided Robert with written statements. Robert refused to pay for the statements, but told Slade and Schmidt's brother that he would encourage his liability insurer to pay them for the statements and supporting testimony. Slade testified, but Schmidt's brother did not.

¶17    Following further briefing by the parties, the Hearing Examiner filed the Final Agency Decision on May 24, 2002. The Hearing Examiner concluded that the Department had jurisdiction over this case, pursuant to § 49-2-509(7), MCA, and that Elvin illegally discriminated against Schmidt because of her sex when he subjected her to *quid pro quo* sexual harassment as a condition of hiring her as a Motel maid. The Hearing Examiner further concluded that Robert, the owner of the Motel who placed Elvin in the manager position without providing a sexual harassment policy to protect employees and applicants, was jointly and severally liable with Elvin to Schmidt for her resulting emotional distress in the sum of $35,000. The Hearing Examiner further concluded that other affirmative relief against Elvin and Robert was warranted.

¶18    Robert appealed the Final Agency Decision to the HRC. The HRC reversed the Final Agency Decision and dismissed Schmidt's complaints. The HRC concluded that the alleged

6

sexual harassment of Schmidt did not occur in an employment context, and thus the Hearing Examiner erred in concluding that the Department had jurisdiction over the case. The HRC further concluded that the Hearing Examiner's finding of discrimination on the basis of sex was not supported by substantial credible evidence. The HRC determined that the parties operated *in pari delicto*, and that Schmidt was aware of the nature of the employment prior to her interview with Elvin. The HRC further found that the *quid pro quo* exchange did not occur during a genuine employment interview, but rather occurred while Schmidt was wearing a wire as part of a police investigation.

¶19    Schmidt appealed to the District Court. On October 7, 2003, the District Court issued its Order affirming the HRC, from which Schmidt now appeals.

**STANDARD OF REVIEW**

¶20   Actions brought before the HRC are subject to the requirements of the Montana Administrative Procedure Act ("MAPA"). *Moran v. Shotgun Willies, Inc.* (1995), 270 Mont. 47, 50, 889 P.2d 1185, 1186.  The standard of review of an agency decision under MAPA, set forth at § 2-4-704(2), MCA, provides in pertinent part:

> The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.  The court may affirm the decision of the agency or remand the case for further proceedings.  The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because:
>
> (a) the administrative findings, inferences, conclusions, or decisions are . . . (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; [or] (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . .

¶21   A three-part test is used to determine whether agency findings are clearly erroneous: (1) the record is reviewed to determine if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, it will be determined whether the agency misapprehended the effect of the evidence; and (3) if substantial evidence exists and the effect of the evidence has not been misapprehended, the reviewing court may still decide that a finding is clearly erroneous if a review of the record leaves the court with a definite and firm conviction that a mistake has been made. *Total Mechanical Heating v. UEF*, 2002 MT 55, ¶ 22, 309 Mont. 84, ¶ 22, 50 P.3d 108, ¶ 22.

¶22   We review conclusions of law to determine if they are correct.  *Moran*, 270 Mont. at 51, 889 P.2d at 1187.

**DISCUSSION**

¶23 Did the District Court err when it upheld the HRC's reversal of the Final Agency Decision?

¶24 Shortly after Schmidt filed her appeal, Robert's counsel withdrew his representation. Robert has not filed a response brief, so this matter comes before us on appellant's brief only.

¶25 Schmidt argues that the District Court erred when it upheld the HRC's reversal of the Final Agency Decision because the HRC's conclusion that the Department did not have jurisdiction over the case was incorrect. Schmidt further argues that it was an abuse of discretion for the HRC to substitute its own findings of fact in place of the Hearing Examiner's when it asserted that Elvin and Robert did not discriminate on the basis of sex, that Schmidt acted *in pari delicto* with Elvin, that Schmidt was aware of the nature of the employment at the Motel prior to her interview with Elvin, and that the *quid pro quo* exchange did not occur during a genuine employment interview.

¶26 Schmidt argues that the HRC's conclusion that the harassment did not occur in the employment context is incorrect as a matter of law and incongruent with the legislative intent of §§ 49-2-205 and -303, MCA. Section 49-2-205, MCA, states that the legislature intends the HRC to sit in independent judgment of complaints of alleged discrimination in Montana. Section 49-2-303(1)(a), MCA, prohibits discrimination in the terms or conditions of employment based on sex.

9

¶27 Schmidt argues that the HRC's allegedly erroneous conclusion stems from a misapprehension of the facts in this case. In its Order Reversing and Dismissing Final Agency Decision, the HRC stated,

> It is unlawful discriminatory practice for an employer to discriminate when interviewing or hiring an individual based upon his or her membership in a protected class. However, it is the determination of the Commission that [the] record does not support the Human Rights Bureau's conclusion that the alleged harassment occurred in an employment context. . . . Since the alleged discrimination did not occur in an employment context . . . the Department of Labor and Industry did not have jurisdiction.

(Internal citations omitted.)

¶28 The presumed basis for the HRC's conclusion that the Department lacked jurisdiction to entertain Schmidt's complaint is the HRC's determination that the Hearing Examiner's finding of discrimination on the basis of sex was not supported by substantial credible evidence. The HRC found that the parties operated *in pari delicto* because, it maintains, Schmidt was aware of the nature of the job at the Motel prior to her interview with Elvin. The HRC further found that the *quid pro quo* exchange, "did not occur during a genuine employment interview," but rather occurred during Schmidt's final meeting with Elvin, which was part of the police investigation.

¶29 Schmidt directs our attention to the following Finding in the Final Agency Decision:

> Elvin Lou Cook informed Schmidt that she would be required, as an employee of Triple Crown Motor Inn, to have sex with him and with customers of the Triple Crown Motor Inn. The sexual conduct was a condition of her employment. Elvin Lou Cook described in detail a wide range of sexual acts that Schmidt would be required to perform with him and with guests.

10

Schmidt observes, "There can be no clearer finding of fact that Ms. Schmidt was subjected to *quid pro quo* sexual harassment during the employment interview process."

¶30    The Hearing Examiner found that Elvin informed Schmidt during the September 29, 2000, job interview that she would be required to have sex with Elvin and with customers of the Motel as part of her job. It is important to note that this factual finding was undisputed at the hearing level, and that the HRC did not determine that this finding was erroneous or unsupported by the record. Moreover, Elvin admitted at his sentencing in the criminal proceeding that he hired women to perform sexual services at the Motel. Clearly, Elvin's offer of employment both contained a *quid pro quo* exchange and occurred when he was interviewing Schmidt. Therefore, there is nothing of record to support the HRC's conclusion that a *quid pro quo* exchange "did not occur during a genuine employment interview," as the HRC found. As pointed out in ¶ 27, the HRC stated in its Order, "It is unlawful discriminatory practice for an employer to discriminate when *interviewing or hiring an individual*. . . ." (Emphasis added.)

¶31    An agency's reversal of a hearing examiner's findings cannot survive judicial review unless the court determines as a matter of law that the hearing examiner's findings are not supported by substantial evidence. *Moran*, 270 Mont. at 51, 889 P.2d at 1187. Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance. *Taylor v. State Compensation Ins. Fund* (1996), 275 Mont. 432, 437, 913 P.2d 1242, 1245 (citation omitted). Our standard is not whether there is evidence to support findings different

11

from those made by the trier of fact, but whether substantial credible evidence supports the trier's findings. *Taylor*, 275 Mont. at 440, 913 P.2d at 1246 (citations omitted).

¶32 Our review of the record indicates substantial credible evidence exists to support the Hearing Examiner's findings. While Schmidt testified that she was aware, prior to her interview with Elvin, that Symington had a sexual relationship with Elvin, she also asserted that she did not know whether Symington was having sex with "johns." Schmidt did not testify as to whether she believed Symington was having sexual relations with Elvin as part of her job. Schmidt explained that Elvin asked her if she "wanted to have an interview with him about the maid service," and she agreed. She said it was during that first interview on the morning of September 29 that Elvin informed her that sexual relations with him and with Motel customers would be part of her job duties.

¶33 The Dissent, likewise, asserts that the record reflects that Schmidt knew *prior to her interview with Elvin*, that the maid position was really a prostitution job. However, the record reflects no such thing. While Schmidt testified that she was aware that Symington was having sexual relations with Elvin, Schmidt further testified that she found out about a job opening at the Motel because Symington told her the Motel was "hiring there for maid service." She further testified that it was after she made Elvin's bed during the job interview and he immediately declared that she was hired without making her fill out a job application that she thought things were "weird," and at that point, he informed her about the sexual component to the "maid" position. Schmidt admitted that she knew that Symington was having sexual relations with Elvin, but further stated that she did not know whether

12

Symington was having sexual relations with "johns" or performing other sexual services at the Motel. This certainly does not support the Dissent's assertion that she *knew* Symington worked as a prostitute. The fact of the matter is that Schmidt was a sixteen-year-old girl with an eighth-grade education and no prior employment experience. While the Dissent would like to fault her for the treatment she received during her interview with Elvin, blaming Schmidt for Elvin's behavior and Elvin's crude remarks to her is both offensive and wrong.

¶34    Although there may be evidence in the record to have supported contrary findings, substantial credible evidence exists to support the Hearing Examiner's findings. Again, the standard is not whether there is evidence to support findings different from those made by the trier of fact, but whether substantial credible evidence supports the trier's findings. *Taylor*, 275 Mont. at 440, 913 P.2d at 1246 (citations omitted). Thus, the HRC erred when it overturned those findings and consequently reached a different conclusion. Moreover, because the HRC erred in overturning the finding that discrimination occurred in the employment context, it likewise erred in concluding that the Department did not have jurisdiction in this matter. We therefore conclude that the District Court erred in upholding the HRC's reversal of the Final Agency Decision.

13

## CONCLUSION

¶35     For the foregoing reasons, we reverse the October 7, 2003, Order of the District

Court, and remand for further proceedings consistent with this Opinion.


                                                    /S/ PATRICIA O. COTTER


We Concur:


/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice John Warner dissents.

¶36    I dissent.  The Court entirely misses the point of the HRC's decision as well as that of the District Court.  A discrimination in employment claim implicitly requires an employment relationship.  Section 49-2-303(1), MCA; *Hanson v. Dix,* 2004 MT 263N, ¶ 14, 323 Mont. 537, ¶ 14, 100 P.3d 167, ¶ 14.  The HRC and the District Court were both correct in concluding that the alleged sexual harassment of Schmidt did not occur in an employment context.

¶37    As noted by the Court, Elvin advertised for a live-in maid.  It does not take a rocket scientist to understand why he did not publically advertise that he was seeking a prostitute to work in the motel.  As noted by the District Court, the record reflects that prior to the interview with Elvin, Schmidt knew full well that the job was really to provide sex.  Schmidt had just spent the night at the motel with her friend who told her she worked there as a prostitute.  When she engaged in the incredibly crude one-half to one hour interview with Elvin on September 29, there was no discussion of employment as a maid.  Although Schmidt testified she was asked to make a bed, this is the only conceivable connection the interview had to any housekeeping or any other legitimate employment duties.  Nor was there any discussion of any compensation to be paid for services as a motel maid either in Great Falls, or in Las Vegas.  Schmidt did not testify that she was ever offered any work as a maid, nor did she say that there was any compensation offered, or even discussed, for maid services.  The only discussion of a *quid pro quo* in either of her interviews with Elvin was that she, herself, could earn between $20,000 to $40,000 per month for her sexual services.

15

There was no discussion of Elvin or the Triple Crown paying her anything. When she agreed to go into the business, she was told she would be required to live in a room at the motel so that she would be available at all times to service customers, not clean rooms.

¶38     The hearings examiner did find, with no direct support from the record, that Schmidt was offered a job as a prostitute working for the Triple Crown Motel. There is no evidence that Elvin or the Triple Crown ever offered to employ Schmidt at all, much less as a maid. The evidence is more indicative that she would be working for herself as a prostitute. However, if the finding of fact by the hearings examiner, that Schmidt was to work for the motel, is sustained based on circumstantial evidence, there still can be no employment relationship.

¶39     An employment relationship is contractual in nature. *Gentry v. Douglas Hereford Ranch, Inc.,* 1998 MT 182, ¶ 38, 290 Mont. 126, ¶ 38, 962 P.2d 1205, ¶ 38; *Craver v. Waste Mgmt. Partners of Bozeman* (1994), 265 Mont. 37, 45, 874 P.2d 1, 5 (overruled on other grounds by *In re Estate of Lande*, 1999 MT 179, 295 Mont. 277, 983 P.2d 316).

¶40     A contract requires a lawful object. Section 28-2-102(3), MCA. A lawful object is one that is not contrary to an express provision of law, or otherwise contrary to good morals. Section 28-2-701(1), (3), MCA. The object of the employment offered was prostitution. *See* § 28-2-601, MCA. It was unlawful for Elvin to procure Schmidt as a prostitute to work in his brother's motel. Section 45-5-602(1)(b), (c), MCA. Whether or not one believes Schmidt was, in her own mind, only considering exchanging sex for compensation, the record makes it abundantly clear that she agreed with Elvin that she would do it. It was

16

unlawful for Schmidt to agree to engage in prostitution. Section 45-5-601(1), MCA. Contracts made in violation of express statutes are contrary to public policy and void. *Glens Falls Ins. Co. v. Irion* (D.C. Mont. 1970), 323 F.Supp. 1164, 1176; *Hutterian Brethren v. Haas* (D.C. Mont. 1953), 116 F.Supp. 37; *Glass v. Basin & Bay State Mineral Co.* (1904), 31 Mont. 21, 31-32, 77 P. 302, 304. Specifically, an employment contract entered into for an illegal purpose is void. Such a contract is unenforceable and actions arising from any such contract cannot be maintained. *Portable Embryonics, Inc. v. J.P. Genetics, Inc.* (1991), 248 Mont. 242, 245-46, 810 P.2d 1197, 1198-99.

¶41 Assuming, *arguendo*, that making beds was actually a part of the employment to be undertaken by Schmidt, it makes no difference at law what interpretation the Court or I place on this part of Schmidt's interview, nor do the words we may use to describe it. It cannot be gainsaid that prostitution was an integral part of the proposed arrangement. Considering the amount of compensation involved, and that there was none offered for maid services, there was to be but a single consideration passing between the parties, and most certainly any contract was not severable between making beds and prostitution. If either part of the separate and distinct acts to be performed, that is, making beds or providing sex, is unlawful or void, the entire contract is void. *See Kelly v. Silver Bow County* (1951), 125 Mont. 272, 275, 233 P.2d 1035, 1036; *see also In re Cummings Estate* (1931), 89 Mont. 405, 413, 298 P. 350, 352.

¶42 There being no possible employment relationship between Schmidt and any defendant in this matter, both the HRC and the District Court were entirely correct to conclude as a

17

matter of law that any alleged sexual harassment or discrimination did not occur in an employment context, and thus dismiss the petition.

¶43    The law must have no tolerance whatever for the reptilian conduct of Elvin, his brother Bob Cook, or their business.  Still, the Court's unwarranted expansion of the Human Rights Act to mandate recovery by a willing participant in criminal conduct, only foiled when her mother called the cops forcing her to turn in her accomplice, defeats the act's noble purpose and must ultimately weaken its effectiveness.  I dissent.


/S/ JOHN WARNER