DA 14-0262

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 28

IN THE MATTER OF:

J.A.B. and L.M.F.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause Nos. DN 09-86 and DN 13-42
Honorable Heidi Ulbricht, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Kathryn McEnery ,McEnery Law Office, PLLC, Hot Springs, Montana
          (*Attorney for Appellant and Father*)

          Jennifer A. Giuttari, Law Office of Jennifer A. Giuttari, PLLC, Missoula, Montana
          (*Attorney for Appellant and Mother*)

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

          Emily Von Jentzen, Assistant Attorney General, Kalispell, Montana

Submitted on Briefs:  December 31, 2014
Decided:  January 27, 2015

Filed:

                                    Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    N.W. (Mother) and J.B. (Father) appeal from orders of the Eleventh Judicial District Court, Flathead County, terminating Mother's parental rights to her children L.M.F. and J.A.B., and Father's rights to his child J.A.B.  We affirm.

¶2    We restate the following issues for review:

1. *Did the District Court abuse its discretion when it terminated Mother's parental rights as to L.M.F. on the basis that Mother had not successfully completed her treatment plan and her condition was unlikely to change?*

2. *Did the District Court abuse its discretion when it terminated Mother and Father's parental rights as to J.A.B. without reunification services on the basis that they had subjected a child to aggravated circumstances?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    Mother is the birth mother of L.M.F., born in 2008, and J.A.B., born in 2012. Father is the birth father of J.A.B.  C.F., the birth father of L.M.F., is presently incarcerated and has executed a conditional relinquishment of his parental rights.  He is not a party to this appeal.

¶4    Mother and Father have struggled with methamphetamine addiction throughout these proceedings.  On December 4, 2009, the Department of Public Health and Human Services (Department) removed L.M.F. from Mother's care based upon allegations that Mother had been using methamphetamine and caring for L.M.F. while under the influence of the drug.  At the time L.M.F. was removed, Mother was sharing a residence with Father, who was described as her "paramour."  It was noted that Father also had a history of methamphetamine use, and the child protection specialist (CPS) then assigned to the family observed that "[L.M.F.] is undoubtedly at a considerable risk if she is

2

residing in the same household as [Father]." The Department had received reports that L.M.F. was left home alone while Mother and Father left the house to use methamphetamine. There were also reports that Mother and Father had smoked methamphetamine in the living room of their home while L.M.F. was asleep in a bedroom. Mother had also left L.M.F. in the care of her own mother, C.H., who was also a methamphetamine user and who had a significant history of involvement with the Department during Mother's childhood.

¶5 L.M.F. was placed with her paternal grandparents, who have cared for her for the majority of the past five years. Following L.M.F.'s removal, Mother had a chemical dependency evaluation and began participating in drug testing and supervised visits with L.M.F. Father was asked to participate in similar services, but refused to become involved. Mother represented to the Department that she and Father had decided to end their relationship. On March 24, 2010, Mother was allowed to begin unsupervised visitation with L.M.F. in her home. At that time, no one else was living in the home, and it was clean and appropriate. Approximately two weeks later, Mother's home was the subject of a drug raid. Father and two other individuals were reportedly living in the home, and drugs were being sold on the premises. On May 17, 2010, L.M.F. was adjudicated a youth in need of care and the Department was granted temporary legal custody.

¶6 On June 10, 2010, the District Court approved a treatment plan requiring Mother to participate in chemical dependency treatment, submit to random urine analysis, undergo a psychological evaluation, participate in individual counseling, maintain a safe

home environment and lifestyle, and participate in supervised visitation and parenting education. Temporary legal custody was extended on multiple occasions to allow Mother more time to work on her treatment plan.

¶7 On October 12, 2011, the Department petitioned for termination of Mother's parental rights. At that time, Mother was not compliant with her treatment plan. There were continued concerns about Mother's relationship with Father. The Department suggested that if Mother and Father continued their relationship, Father needed to be a part of the treatment plan. Mother denied having an ongoing relationship with Father, but at the time the Department petitioned for termination of her parental rights, she was pregnant with his child.

¶8 The petition for termination indicated that Mother had nine positive drug screenings, mostly indicating marijuana use. A hair test on April 10, 2011, showed evidence of methamphetamine use. Mother admitted cheating on urine screenings prior to the positive hair test. She tested positive for suboxone in August 2011, while she was pregnant. Additionally, Mother had several noncompliant tests, and had not reported for testing at all during the month of February 2011.

¶9 Mother's counselor reported that she had not been consistent in attending individual counseling sessions. Mother did not disclose to the counselor why she could not attend. Mother was not able to maintain appropriate housing. She shared a home with her mother and a friend, both of whom were on felony probation and were known to have violated that probation by consuming alcohol. When told this was an unsuitable situation, Mother made plans to move in with another friend, who also had a criminal

4

record and a history of Department involvement. Despite these concerns, the petition also indicated that during supervised visits with L.M.F., Mother demonstrated many positive parenting skills, including her ability to respond appropriately to L.M.F.'s cues, engage in age-appropriate activities, and use appropriate discipline.

¶10 A hearing on the petition for termination was set for February 21, 2012. Mother requested a continuance on the basis that her due date was only a few days before the hearing. The hearing was rescheduled for March 26, 2012. Meanwhile, J.A.B. was born in February. The Department was involved with J.A.B. from birth, but decided against removal after Mother and Father agreed to a voluntary protective services agreement. Mother also agreed to live in a supervised foster home with Vicki Peterson pending her admission to Mountain Home, a residential program for young mothers. As a result of these developments, the Department moved to extend temporary legal custody and continue the termination hearing regarding L.M.F. for a period of three months.

¶11 On March 20, 2012, the Department filed for temporary legal custody of J.A.B. after Mother failed to complete drug testing as required by the voluntary protective services agreement. There were also ongoing concerns about Father's possible drug use. Mother and Father did not object to the adjudication of J.A.B. as a youth in need of care and the granting of temporary legal custody to the Department. Nevertheless, because of his young age, J.A.B. was allowed to remain with Mother under Peterson's supervision, and later in Mountain Home.

¶12 Mother was admitted to Mountain Home in mid-May and reportedly fared well in the program. On May 30, 2012, however, the Department notified counsel for Mother of

its intent to move forward with the termination hearing regarding L.M.F. CPS Lindsey Santa provided an updated affidavit stating the factual basis for termination, in which she observed that termination of parental rights is presumed to be in a child's best interest if the child has been in foster care for 15 of the most recent 22 months. Santa noted that L.M.F. had already been in foster care for twice that long, and Mother would need another six months to complete the program at Mountain Home. Santa stated that prior to her entry to Mountain Home, Mother had failed to show stability for any significant length of time.

¶13 While the termination hearing regarding L.M.F. was pending, Mother completed the program at Mountain Home, and she and J.A.B. moved back into the home with Father. Father was also working on a treatment plan. On August 24, 2012, the Department moved to vacate the termination hearing regarding L.M.F. and extend temporary legal custody in order to allow Mother to continue her progress. On December 26, 2012, the case involving J.A.B. was dismissed, because both parents were successfully meeting their treatment plan goals. The Department allowed L.M.F. to begin the transition back to Mother and Father's home, noting that Mother had been complying with all Department requests.

¶14 On June 6, 2013, three weeks after L.M.F. had transitioned to Mother and Father's home, the Department received a report regarding Mother's use of methamphetamine. The Department conducted a visit to the home that day. Mother and Father were asked to provide urine samples for testing, but neither was able to provide a sample. They were asked to test again the next day, but failed to show up. The Department conducted

6

unannounced home visits for each of the next two days, but Mother and Father were not home. Another visit was conducted on June 10, 2013, and although a car was in the driveway, no one answered the door. Santa later spoke with Father and scheduled a hair test for June 11, 2013. Father, who normally shaves his head, asked if arm hair could be tested instead, and Santa replied that it could. At the time Mother and Father reported for the hair test, Father had shaved his beard and underarms, which Santa believed was an attempt to evade testing. A test of Father's leg hair was inconclusive. The results of Mother's hair test, received on June 20, 2013, were positive for both amphetamine and methamphetamine.

¶15 The Department decided to remove the children following Mother's positive test result. Both children were placed in foster care with L.M.F.'s paternal grandparents. Santa went to Mother's home on June 20, 2013, and spoke with Mother. Mother told her, "We only used once for three days." Mother indicated Father had also been using. Santa observed that Mother's eyes were glassy and she struggled to follow a conversation. Santa did not speak with Father at that time.

¶16 On June 27, 2013, the Department filed a petition for termination of Mother and Father's parental rights with respect to J.A.B. and requested a determination that reunification efforts were not required. On July 3, 2013, Santa filed a supplemental affidavit, stating that a hair test done on J.A.B. was positive for amphetamine and methamphetamine at levels significantly higher than Mother's. A hair test done on L.M.F. was inconclusive because the sample was insufficient. Mother denied using around the children, but said she had been breastfeeding J.A.B. Santa informed Father of

7

the test results, and he responded, "That's not good." On July 23, 2013, the Department filed a renewed petition for termination of Mother's parental rights with respect to L.M.F., citing Mother's continued methamphetamine use and the children's possible exposure while in the home.

¶17 A termination hearing was held beginning September 26, 2013, and resuming on February 18 and 19, 2014. At the termination hearing, Nikki Streeter, who administered Mother's drug tests at Glacier Center, testified that of the 191 tests offered to Mother between December 2009 and February 2013, 91 were noncompliant and 16 were positive. Less than half of the tests were negative. Streeter also said Mother had admitted cheating on her urine tests. Father had been tested for a shorter period of time—March 2012 through February 2013—and during that time had one noncompliant and four positive results.

¶18 Mother had worked with two different addiction counselors, both of whom testified. Sara Thorman treated Mother from November 2010 until December 2011. Thorman discharged Mother from treatment in December 2011, finding she had reached "maximum benefit." Thorman described this as, "[M]aximum benefit is that you have been given everything and every chance that's possibly out there, but you're not responding." Thorman was aware Mother had relapsed during treatment, and did not believe she was sufficiently engaged with resources like AA or NA. Mother worked with Tyler Hensleigh beginning in September 2013. At the February 2014 hearing, Hensleigh testified that in Mother's previous attempts to deal with her addiction, she "didn't really have that sober support network" and was "white-knuckling it" on her own. Hensleigh

8

testified that he believed Mother now had the support she needed. He observed that within the first month and a half of treatment, she had met all the goals she previously failed to address with Thorman, including getting a job, paying restitution, participating in AA, and finding a sponsor. Hensleigh estimated that Mother would be able to complete treatment within two to four months, and said her prognosis for long-term recovery was good.

¶19 Angie Garrett provided counseling and chemical dependency treatment to Father beginning in May 2012. She also provided counseling sessions to Mother and Father as a couple. At the September 2013 hearing, Garrett testified that by the time the children were removed in June 2013, she was no longer seeing Mother and Father. They contacted her after their relapse, however, and Father's testimony indicated that they continued to see her from time to time. Garrett testified to her belief that "relapse is a part of recovery." Father's AA sponsor testified that Father appeared motivated to remain sober. Father also testified that he had met with a counselor from Flathead Valley Chemical Dependency and followed her recommendations, although that counselor was unavailable to testify at the hearing.

¶20 Many witnesses at the hearing testified that despite their chemical dependency issues, Mother and Father appeared to be capable and loving parents. Paulette Lawrence, a social worker with the Flathead City-County Health Department's Baby Steps program, testified that she started working with Mother in November 2011, during her pregnancy. Lawrence testified that Mother's attachment with J.A.B. "wasn't anything that I had to teach her to do, it just came from inside of her." Mother had "an innate ability" to read

J.A.B.'s cues. Lawrence testified that Mother was very intelligent and eager to learn about J.A.B.'s development. J.A.B. appeared happy and well cared for. Lawrence participated in Family Group Decision Making meetings, and she reported that everyone in the meetings believed Mother was "a good mom." Lawrence testified that she called Santa and "begged" her to reconsider the petition for termination of parental rights, something she had never done before. Lawrence also believed that the treatment group "missed something in providing a plan for [Mother]" regarding her drug use. Lawrence's observations were limited to interactions between Mother and J.A.B. Lawrence had limited interactions with Father and had not observed Mother with L.M.F.

¶21 Cami Imperato supervised the family's visits at Family Concepts. She testified that Mother and Father were very engaged with both L.M.F. and J.A.B. during visits. Mother and Father were always prepared for visits, followed the children's lead during play, and read the children's cues very well. Imperato remembered one or two incidents giving rise to minor issues with safety, like J.A.B. walking with a toothbrush or Popsicle stick in his mouth. Mother and Father were able to offer appropriate redirection "almost all of the time." Imperato was impressed by Mother's ability to manage L.M.F.'s tantrums and reported that Mother had sought out her own parenting resources and done extra reading, in addition to incorporating the parenting suggestions she received from Family Concepts. The children were happy to see Mother and Father, and seemed to have good bonds with both. Imperato said she struggled to find something for them to work on.

¶22 Craig Dowellgrim worked with Father through the Flathead City-County Health Department's Pregnant and Parenting Teen program. Dowellgrim testified that Father appeared very motivated to become a better parent. Because Father was not a "teen," he had to do much of the program on his own and be self-directed. Dowellgrim said Father was one of the few participants who "really engaged" in the program. He observed a positive bond between Father and J.A.B.

¶23 Santa testified, "Typically, with [Mother], when she is under the microscope she does step up and is able to maintain her sobriety." Santa was concerned, however, that with the withdrawal of Department supervision, or when termination was no longer pending, Mother would become noncompliant and relapse into drug use. She was also concerned that Father initially refused to participate in a treatment plan regarding L.M.F., despite residing in the same home and having a relationship with Mother, and that he appeared to be evading drug testing following the most recent relapse. Santa also testified that Mother had not completed her treatment plan regarding L.M.F., because she had not maintained a drug and alcohol free lifestyle or consistently complied with drug testing. Mother had not followed through on the recommendations from her psychological evaluation and did not successfully or consistently participate in individual counseling. Mother was not able to meet the goal of maintaining a safe and stable residence, because although her housing was stable, drug use had occurred in the home.

Santa did testify that Mother had completed the portions of her treatment plan relating to visitation and parenting skills.[1]

¶24 The District Court terminated Mother's rights to L.M.F., finding that she had not successfully completed her treatment plan, and the condition rendering her unfit was unlikely to change within a reasonable time. The District Court also terminated Mother and Father's rights to J.A.B. The District Court determined that reunification services were not required with respect to J.A.B. because Mother and Father had exposed a child, L.M.F., to chronic and severe neglect. Alternatively, the District Court found that J.A.B.'s exposure to methamphetamine constituted an aggravated circumstance justifying termination of parental rights without reasonable efforts to provide reunification services.

## STANDARDS OF REVIEW

¶25 We review a district court's termination of parental rights for an abuse of discretion. *In re E.Z.C.*, 2013 MT 123, ¶ 19, 370 Mont. 116, 300 P.3d 1174. A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice. *E.Z.C.*, ¶ 19. We review a district court's findings of fact to determine whether they are clearly erroneous. *In re A.D.B.*, 2013 MT 167, ¶ 27, 370 Mont. 422, 305 P.3d 739. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that the district court made a mistake. *A.D.B.*, ¶ 27. When reviewing for clear

---

[1] Testimony from several additional witnesses was heard, and additional facts will be discussed as needed.

12

error, "[o]ur standard is not whether there is evidence to support findings different from those made by the trier of fact, but whether substantial credible evidence supports the trier's findings." *Schmidt v. Cook*, 2005 MT 53, ¶ 31, 326 Mont. 202, 108 P.3d 511. Moreover, it is within the province of the District Court to determine the credibility of witnesses and the weight to be given their testimony, and we will not disturb those determinations on appeal. *In re B.J.T.H.*, 2015 MT 6, ¶ 16, 374 Mont. 14, ___ P.3d ___. We review conclusions of law for correctness. *A.D.B.*, ¶ 27.

## DISCUSSION

¶26     1.   *Did the District Court abuse its discretion when it terminated Mother's parental rights as to L.M.F. on the basis that Mother had not successfully completed her treatment plan and her condition was unlikely to change?*

¶27     A district court may order termination of the parent-child legal relationship if the child has been adjudicated a youth in need of care and the court finds, by clear and convincing evidence, that an appropriate treatment plan has not been complied with, and that the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. Mother does not contest the adjudication of L.M.F. as a youth in need of care and does not argue that her treatment plan was not appropriate. She claims the record does not support the District Court's findings that she was not compliant with her treatment plan. A parent must fully comply with a treatment plan. *In re D.F.*, 2007 MT 147, ¶ 30, 337 Mont. 461, 161 P.3d 825. Partial or even substantial compliance is not sufficient. *D.F.*, ¶ 30.

¶28     The first goal of Mother's treatment plan was to address her chemical dependency. Within that goal, Mother was to attend all of her scheduled appointments with her

13

chemical dependency counselor, maintain consistency in her participation in treatment, review her progress regularly with the Department, and maintain a drug and alcohol free lifestyle. Mother was required to be "in full compliance and completion" of chemical dependency treatment before a transition plan could be implemented for L.M.F.

¶29 The testimony presented to the District Court supports the finding that Mother did not fully comply with this aspect of her treatment plan. Thorman testified that Mother did not regularly attend her individual counseling sessions. Thorman ultimately discharged Mother from treatment in December 2011, finding that she had "been given . . . every chance that's possibly out there, but [was] not responding." Mother's more recent counselor, Hensleigh, believed her prognosis for long-term recovery was good; however, Hensleigh had only been working with Mother since September 2013, after the children were removed and the Department filed for termination of parental rights. Hensleigh's testimony about Mother's recent progress is consistent with Santa's observation that Mother is able to maintain sobriety "when she is under the microscope." Moreover, Hensleigh only began working as an addiction counselor in August 2013, and was not fully licensed until January 2014.

¶30 Undisputedly, Mother was not able to maintain a drug and alcohol free lifestyle. She admits relapsing into methamphetamine use in June 2013. Prior to that relapse, more than half of her drug screenings were either positive or noncompliant. Despite Mother's progress in the six months immediately preceding Hensleigh's testimony, the record as a whole supports the District Court's finding that she was not compliant with the chemical

14

dependency portion of her treatment plan. *See In re J.C.*, 2003 MT 369, ¶ 17, 319 Mont. 112, 82 P.3d 900.

¶31 The second component of Mother's treatment plan was participation in random urine analysis. As noted, between December 2009 and February 2013, Mother was noncompliant with 91 tests. The record supports the District Court's finding that Mother did not comply with this aspect of her treatment plan. Mother's treatment plan also required her to participate in individual counseling. Mother cites testimony by Garrett, Imperato, and Peterson regarding her "progress in complying with therapy." None of these persons, however, were Mother's individual counselors. Garrett provided individual counseling to Father and couple and family counseling to Mother and Father. Imperato supervised visitation at Family Concepts. Peterson is a foster parent who supervised Mother while she resided in Peterson's home pending her admission to Mountain Home. While these witnesses did testify to Mother's positive parenting skills, parenting skills were not among the recommendations identified in Mother's psychological evaluation. Those recommendations included addressing chemical dependency and relationship issues. The only testimony regarding Mother's individual counseling was from Thorman, who discharged Mother due to a lack of progress, and Hensleigh, who did not begin treating Mother until the same month the termination hearing began. The District Court's finding that Mother was not compliant with this aspect of her treatment plan was not clearly erroneous.

¶32 Mother's treatment plan also required her to maintain a safe and stable lifestyle. Mother argues that she completed this task because she had secured employment, was

steadily increasing her life skills, and was regularly attending church and AA. While these are positive developments, they appear to have taken shape only after the Department's most recent petition for termination. The children were admittedly exposed to drug use in the home. The record demonstrates an overall pattern in this case, pending since 2009, of periods of stability concurrent with intensive Department involvement, marred by relapses concurrent with the transition to greater independence. The District Court appropriately viewed Mother's recent progress in the context of the complete record. The District Court's finding that Mother failed to maintain a safe and stable lifestyle is not clearly erroneous.

¶33 Finally, Mother contests the District Court's finding that she did not comply with the portion of her treatment plan requiring her to participate in supervised visitation and parental skills building. Extensive testimony was heard about Mother's positive interactions with the children during supervised visitation, and her extraordinary efforts to participate in parenting education and skills building. Nevertheless, the District Court observed that "an ability to move past the supervised visitation setting has not been demonstrated on a long term basis." The treatment plan timeline called for Mother to "progress from supervised to semi-supervised to unsupervised" visitation, and yet Mother was unable to maintain unsupervised visitation after years of Department involvement. Despite testimony that Mother is "a good mom," the District Court's finding that Mother did not comply with this portion of her treatment plan was not clearly erroneous. To the extent that Mother partially complied with the tasks of maintaining a safe and stable lifestyle and participating in supervised visitation and parenting education, these efforts

16

were nonetheless unsuccessful in demonstrating the long-term changes the treatment plan was ultimately designed to accomplish. *See D.F.*, ¶ 29; *In re J.V.*, 2003 MT 68, ¶ 18, 314 Mont. 487, 67 P.3d 242.

¶34 Mother also contests the District Court's conclusion that the condition rendering her unfit to parent was unlikely to change within a reasonable amount of time. In determining whether the condition of the parent is unlikely to change within a reasonable time, the court must consider the following non-exclusive factors: emotional illness, mental illness, or mental deficiency of the parent; a history of violent behavior by the parent; excessive use of drugs or alcohol by the parent; and any present judicially-ordered long-term confinement of the parent. Section 41-3-609(2), MCA; *D.F.*, ¶ 23. The court must enter a finding that continuation of the parent-child relationship will likely result in continued abuse and neglect, or that the condition of the parent renders him or her unfit, unable, or unwilling to provide adequate care. Section 41-3-609(2), MCA. The court is to give primary consideration to the physical, mental, and emotional needs of the child. Section 41-3-609(3), MCA. In assessing whether a parent's condition is unlikely to change, the district court should assess a parent's past and present conduct. *In re D.H.*, 2001 MT 200, ¶ 32, 306 Mont. 278, 33 P.3d 616.

¶35 Mother claims the evidence shows she was actively addressing her chemical dependency issues, and had been successful with the exception of the June 2013 relapse. Mother has been involved with the Department on the basis of her drug use since 2009. At the termination hearing, Santa testified that the circumstances under which the children were removed in June 2013 were very similar to the circumstances under which

17

L.M.F. was initially removed in December 2009, three and a half years earlier. The District Court found, consistent with Santa's testimony, that "[t]he record in this matter contains several examples of birth mother's ability to comply with requests when she is up against severe consequences . . . however, the Department cannot keep a termination pending until these children turn 18 to elicit compliance from birth mother." The District Court cited the more than 762 hours of services provided to the family over the course of four years in support of its conclusion that Mother's struggle with chemical dependency and its effect on her parenting were unlikely to be resolved within a reasonable time.

¶36 The District Court appropriately considered Mother's recent progress. It placed this progress, however, within the larger context of Mother's repeated drug use and noncompliant UAs. While it is to be hoped that Mother's current efforts will be successful, "'we do not have a crystal ball to look into,'" and therefore our consideration of whether Mother's condition is likely to change "'must, to some extent, be based on [her] past conduct.'" *In re M.T.*, 2002 MT 174, ¶ 34, 310 Mont. 506, 51 P.3d 1141 (quoting *In re M.A.E.*, 1999 MT 341, ¶ 37, 297 Mont. 434, 991 P.2d 972). Moreover, primary consideration must be given to the needs of the child. Section 41-3-609(3), MCA. L.M.F. is in a stable foster placement with her paternal grandparents, where she has remained since 2009, and who intend to adopt her. Santa testified that she has never had another case that lasted this long before termination. L.M.F.'s need for permanency must be considered. The District Court's finding that Mother's condition was unlikely to change within a reasonable time was not clearly erroneous.

18

¶37 Based upon these findings, the District Court did not abuse its discretion when it terminated Mother's parental rights as to L.M.F. If a child has been in foster care for 15 of the most recent 22 months, termination of parental rights must be presumed to serve the best interests of the child. Section 41-3-604(1), MCA. At the time the hearing concluded in February 2014, L.M.F. had been in foster care for 50 months. During that period, she transitioned to her Mother's care for only three weeks before being removed again. Termination was in L.M.F.'s best interests. The District Court did not abuse its discretion.

¶38 *2. Did the District Court abuse its discretion when it terminated Mother and Father's parental rights as to J.A.B. without reunification services on the basis that they had subjected a child to aggravated circumstances?*

¶39 The Department must make reasonable efforts to reunify a family that has been separated by the State, unless a court determines that reunification services need not be provided. Section 41-3-423(1), (2), MCA. A court may make such a determination if it finds that the parent has subjected a child to aggravated circumstances, including but not limited to abandonment, torture, chronic abuse, sexual abuse, or chronic and severe neglect. Section 41-3-423(2)(a), MCA. Child abuse or neglect includes "actual physical or psychological harm to a child or substantial risk of physical or psychological harm to a child by the acts or omissions of a person responsible for the child's welfare." Section 41-3-102(7)(b)(i)(A), MCA. The child's parent, guardian, foster parent, or an adult who resides in the same home are all persons responsible for the child's welfare. Section 41-3-102(2)(a), MCA. The child subjected to aggravated circumstances need not be the

19

child who is the subject of the petition for termination. *See In re L.N.*, 2014 MT 187, ¶ 24, 375 Mont. 480, 329 P.3d 598.

¶40 Neglect is chronic when it is "'marked by long duration, by frequent recurrence over a long time, and often by slowly progressing seriousness.'" *In re M.N.*, 2011 MT 245, ¶ 27, 362 Mont. 186, 261 P.3d 1047 (quoting *Webster's Third New International Dictionary* 402 (1961)). Furthermore, "[d]iscrete instances of neglect, when viewed within a consistent pattern of similar behavior, provide a clear basis by which a district court can find 'chronic, severe neglect.'" *M.N.*, ¶ 30. Because the best interests of the children are paramount, "[c]hildren need not be left to 'twist in the wind' before neglect may be found chronic and severe." *M.N.*, ¶¶ 14, 29. Chronic and severe neglect has been found where children were left unattended, were exposed to drug use, and where the parents' drug use continued over a long period of time, despite receiving Department services. *E.Z.C.*, ¶ 28.

¶41 The District Court determined that reunification services were not required because Mother and Father had subjected a child, L.M.F., to the aggravated circumstance of chronic and severe neglect. Alternatively, the District Court found that J.A.B.'s exposure to methamphetamine constituted an aggravated circumstance. The evidence shows that at the time L.M.F. was initially removed in December 2009, Mother and Father were both residing in the home with L.M.F. Thus, although Father is not L.M.F.'s parent, he was a person responsible for her welfare. Section 41-3-102(2)(a), MCA. Reports at the time of L.M.F.'s removal indicated that Mother and Father were using drugs in the home and were leaving L.M.F., then 14 months old, at home alone, or

expecting their roommates to care for her, while they went out to use methamphetamines. The circumstance of leaving L.M.F., a 14-month-old infant, without appropriate supervision or care exposed L.M.F. to substantial risk of harm. Section 41-3-402(7)(b)(i)(A), MCA; *E.Z.C.*, ¶ 28. Following the removal, as a person responsible for L.M.F.'s welfare, Father was asked to participate in a treatment plan and reunification efforts. He refused, and Mother misled the Department about their continued relationship. When Mother was allowed unsupervised visitation at home with L.M.F. in March 2010, Father was again residing in the home, and drugs were being used and sold in the home. This circumstance again exposed L.M.F. to substantial risk. Section 41-3-402(7)(b)(i)(A), MCA; *E.Z.C.*, ¶ 28. Following this report, Mother continued to mislead the Department about her relationship with Father, and Father continued to refuse to participate in reunification services. In June 2013, Mother and Father were residing in the home with both L.M.F. and J.A.B. Mother used methamphetamine in the home during this time. Rather than removing L.M.F. and J.A.B. from the environment, Father joined Mother in using methamphetamine in the home. He then attempted to evade drug testing by shaving his facial and body hair.

¶42 Father acknowledged at the termination hearing that the circumstances of the children's removal in June 2013 were very similar to the circumstances that existed when L.M.F. was removed in December 2009. Thus, the circumstance of L.M.F.'s exposure to substantial risk while in the care of Mother and Father has persisted for four years. Throughout the pendency of this case, Mother and Father have continued to periodically use methamphetamine while the children are in the home. Their drug use, and the

21

resulting risk to the children, is a recurring, chronic problem. *M.N.*, ¶ 27. The evidence shows multiple, discrete instances of neglect occurring over a long period of time. *M.N.*, ¶ 29. This is sufficient to substantiate a finding that Mother and Father exposed L.M.F. to chronic and severe neglect, and thus a determination that reunification services were not required with respect to J.A.B. Section 41-3-423(2), MCA. Because we affirm the District Court's finding of aggravated circumstances as to L.M.F., we need not address the District Court's alternative finding that J.A.B. was also subjected to aggravated circumstances.

¶43 Based upon the finding that Mother and Father had subjected a child, L.M.F., to chronic and severe neglect, the District Court terminated Mother and Father's parental rights as to J.A.B. While testimony at the termination hearing demonstrated that J.A.B. was securely attached to both Mother and Father, the District Court nevertheless found that termination was in J.A.B.'s best interests. On appeal, the question is not whether the evidence could also support different findings, but whether the District Court's findings are supported by substantial evidence in the record. *E.Z.C.*, ¶ 19; *Schmidt*, ¶ 31. Mother tested positive for suboxone during her pregnancy and for methamphetamine while breastfeeding. J.A.B. also tested positive for methamphetamine, likely due to exposure through Mother's breast milk. Father also used methamphetamine while in the home. The extensive record pertaining to both parents demonstrates a pattern of periodic, but not sustained, sobriety. This failure to demonstrate sustained sobriety has resulted in L.M.F. spending five years, by the time of this appeal, in foster care. It is in J.A.B.'s best

interests to pursue permanency. The District Court did not abuse its discretion when it terminated Mother and Father's parental rights as to J.A.B.

## CONCLUSION

¶44 The Order of the District Court terminating Mother's parental rights as to L.M.F. on the basis that Mother failed to complete her treatment plan, and that her condition was unlikely to change within a reasonable time, is affirmed. The Order of the District Court terminating Mother and Father's parental rights as to J.A.B. without reunification services on the basis that they had subjected a child, L.M.F., to aggravated circumstances is also affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE