DA 14-0225

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 75

IN THE MATTER OF:

A.H., L.M., and J.M.,

   Youths in Need of Care.

APPEAL FROM: District Court of the Eighth Judicial District,
       In and For the County of Cascade, Cause Nos. BDN 11-179, BDN 11-180,
       and BDN 11-181
       Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

   Johnna K. Sutton, Van de Wetering & Sutton, P.C., Missoula, Montana

   For Appellee:

   Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Assistant
   Attorney General, Helena, Montana

   John W. Parker, Cascade County Attorney, Jennifer Ropp, Deputy County
   Attorney, Great Falls, Montana

          Submitted on Briefs: February 11, 2015
              Decided: March 10, 2015

Filed:

                      
             Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     T.M. (Mother) appeals from orders of the Eighth Judicial District Court, Cascade County, terminating her parental rights to her three children, A.H., L.M., and J.M. We affirm.

¶2     Mother presents the following issues for review:

1. *Whether Mother's due process rights were violated by delays in holding the show cause, adjudicatory, and dispositional hearings.*

2. *Whether the District Court erred when it found that Mother failed to complete her treatment plan and the condition rendering her unfit to parent was unlikely to change within a reasonable time.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3     The children involved in this proceeding are J.M., born in 2006, L.M., born in 2009, and A.H., born in 2010. T.T. is the father of J.M., A.A. is the father of L.M., and F.H. is the father of A.H.[1] The Department of Public Health and Human Services (Department) received its first report concerning the children on July 6, 2011. At that time, it was reported that L.M. had a bite mark on his thigh that appeared to be "adult size." A child protection specialist investigating the report was informed that L.M. had been bitten by another child at day care.

¶4     A second report was received on July 11, 2011. The report indicated that J.M. had bruises around her arms that resembled fingerprints. J.M. also had a bite mark on her shoulder. When asked if her little brother bit her, J.M. replied that only F.H. bites her. A safety plan was put in place instructing Mother to prevent the children from having

_____

[1] T.T. and A.A. could not be located during these proceedings. Their parental rights were terminated on grounds of abandonment at a hearing on April 4, 2013. F.H. relinquished his parental rights at that time. None of the fathers are participating in this appeal.

2

contact with F.H. During a follow-up interview on August 4, 2011, Mother said F.H. was no longer living with her.

¶5 On the morning of August 9, 2011, the Department was called to Apple Tree Daycare to investigate injuries to L.M. L.M. had extensive bruising on his left shoulder, leg, and buttocks. A bruise on the back of his thigh resembled a hand mark. J.M. told child protective specialists Mother was the only adult in the home. J.M. also reported witnessing violence between F.H. and Mother, including an incident in which F.H. pushed Mother into a table, causing the table to break. J.M. said Mother "pushes [F.H.] and slaps him in the face."

¶6 Mother was contacted about the injuries to L.M. and stated that J.M., who was four years old at the time, caused the bruising by hitting L.M. with a toy paddle. The children were later examined by pediatrician Dr. Michael Garver, who concluded that the injuries could not have been caused by a four-year-old child. Dr. Garver also observed a bruise on J.M.'s arm that looked like a bite mark and "seemed to be of adult size." Mother was interviewed by a detective from the Great Falls Police Department and repeated that she believed J.M. had caused the injuries to L.M. She said J.M. had hit L.M. with the paddle "45 times." Mother then stated that she experiences "blackouts" and that it was possible she had caused the injuries to L.M. during one of these episodes.

¶7 The Department removed the children from Mother's care on August 9, 2011, and filed a petition for emergency protective services, adjudication of the children as youths in need of care, and temporary legal custody on August 15, 2011. A show cause hearing was set for September 22, 2011. On September 2, 2011, the Department requested a

3

continuance because two of its key medical witnesses were unavailable on the hearing date. The Department's motion noted that Mother objected to the continuance. The hearing was set for December 8, 2011, and then moved to November 10, 2011, when that date became available on the court calendar. On November 9, 2011, the Department requested a second continuance on the grounds that it had been unable to locate the fathers of J.M. and L.M. and would need additional time to complete service by publication. The motion does not indicate whether Mother was contacted or opposed the request. The motion was granted the same day and the hearing was reset for December 15, 2011.

¶8 Although Mother had objected to the September 2, 2011 motion to continue, she did not file any subsequent objection to the delay in holding a show cause hearing, nor did she verbally raise an objection or move to dismiss the petition during the December 15, 2011 hearing. Testimony at the hearing indicated that the Department had already contacted both Mother and F.H. in an attempt to initiate services, and that Mother had in fact already completed a parenting education program and received visitation through Healthy Mothers, Healthy Babies. The District Court adjudicated the children youths in need of care and granted emergency protective services and temporary legal custody. The District Court then set a dispositional hearing for February 9, 2012. Mother did not object to the timing of the dispositional hearing. At the dispositional hearing, Mother agreed to a treatment plan. The treatment plan required her to complete a psychological evaluation, participate in domestic violence classes, sign all necessary releases and contact the Department on a weekly basis, attend age-appropriate parenting

4

classes, complete an in-home parenting program, follow recommendations made by the children's service providers, maintain regular contact with the children, have enough income to meet the children's needs, and maintain a safe and stable home environment.

¶9 On September 4, 2012, the Department requested an extension of temporary legal custody for six months to allow Mother more time to work on her treatment plan. In an affidavit accompanying the petition, the child protection specialist then assigned to the case noted that if Mother did not "make substantial progress in the next 2-3 months," the Department would file a petition for termination of parental rights. Mother did not object to the extension of temporary legal custody. Noting that the case had already "been open . . . way, way too long," the District Court granted an extension of only 90 days, at which time "either we should be in a position where it can be closed because of compliance, or, if not complied with, then there will be a situation where . . . the State will have to file its petition for termination."

¶10 On December 6, 2012, Mother moved the District Court to order the children returned to her care, stating that "[t]he children should be returned with the mother in this case because Counsel feels that the Mother has completed enough of her treatment plan to begin the reunification process." On January 16, 2013, the Department filed a petition to terminate Mother's parental rights on the grounds that her treatment plan had not been completed and the conditions rendering her unfit to parent were unlikely to change within a reasonable time.

¶11 A hearing on Mother's motion for reunification was held January 17, 2013. At that hearing, child protection specialist Talisa Hides testified that although Mother had

attended counseling and parenting education sessions, she had not completed the mental health portion of her treatment plan. She testified that there were concerns about whether Mother was "really engaging" in counseling, rather than participating superficially. Mother maintained only intermittent contact with the Department, and during many of her conversations with Hides, "would yell and scream and swear." Mother particularly opposed moving the children to a new foster placement in another city, although it was the only available placement where all three children could be together. Hides also observed that Mother was no longer allowed to attend the children's visits with Dr. Garver due to her behavior in his office. Hides said Mother "continued to not accept responsibility for her actions."

¶12 Dr. Garver testified that L.M. "had some very . . . regressive-type activity where he would act like a dog, and he was involved in biting both his sister and other children." Dr. Garver recounted an incident in which L.M., at age two, had attacked an infant. Dr. Garver treated the infant, who "actually looked like she'd been mauled by a dog." Dr. Garver said L.M.'s behavior "was one of the most significant cases of traumatic child abuse behavior that I've had to treat in my career." L.M. improved significantly while in foster care. Dr. Garver further testified that "these children were traumatized beyond anything that I've ever seen before."

¶13 The children's counselor, Lisa Anderson Mangan, testified that L.M.'s behavior had improved "tremendously," to the extent that he was discharged from counseling. Anderson Mangan testified that J.M. had made several disclosures to her regarding abuse by Mother and F.H. J.M. said F.H. cut her on the area between her legs. J.M. also said

6

Mother "had touched her private parts and had allowed others to touch her private parts." J.M. was diagnosed with attention deficit hyperactivity disorder, reactive attachment disorder, and post-traumatic stress disorder. Anderson Mangan believed J.M. would need ongoing counseling.

¶14 Carrie Galvez, who provided foster care to J.M. and L.M. for approximately 15 months before they were moved to a new placement with A.H., also testified. Galvez said that when L.M. entered care, "he had traits, characteristics of what one might consider a dog where he'd be on all fours, he would bark, he would growl at you, he would charge at you, he would try to bite you." L.M. would also "dig[] through the garbage, looking for food." J.M. frequently masturbated, particularly while in the bath. In response to this behavior, Galvez discussed with J.M. "private parts and who can touch your private parts," and "explained that a doctor can touch your private parts." J.M. responded, "[F.H.] touches my private parts." J.M. exhibited a fear of running water in the bathtub, describing one incident when Mother forgot to turn off the water and J.M. thought she would drown, and another when Mother "began yelling at her" and "submerged her head under water, and [J.M.] was crying and screaming bubbles." J.M. also disclosed to Galvez that L.M. was locked up in a dog kennel and fed dog treats. Galvez noticed a "huge difference" in the children's behavior while they were in her care.

¶15 At the conclusion of the hearing, the District Court found that "in order for the Court to feel comfortable with a reunification, there needs to be more time that passes here for additional time for the Mother to work on her issues." The District Court said it

would need to hear testimony from Mother's therapist regarding her progress before the children could be returned.

¶16 The Department's petition for termination of Mother's parental rights was heard on April 4, 2013. Dr. Susan Day, who performed Mother's psychological evaluation, testified that Mother was cooperative and forthcoming during the interview. Dr. Day observed that Mother "[has] a lot of difficulty coping with everyday stress" and "tends to externalize blame for her problems in her life." Dr. Day further testified that Mother "has a hard time identifying ways in which she can alter the course or take some responsibility for what's happened, particularly regarding her children." Mother's tendency to externalize blame could prevent her from improving her functioning and judgment, which Dr. Day believed could make the children vulnerable. Dr. Day recommended that Mother participate in individual therapy for at least nine months.

¶17 Angela Meyers, Mother's therapist, testified that Mother began attending a domestic violence group facilitated by Meyers in February 2012. Mother was also referred to Meyers for individual counseling, which she began in July 2012. Meyers found that Mother made progress in some areas, but lacked insight and showed an "inability to take responsibility for some of the events that led to involvement with the Department at first." Meyers found this concerning because "if she's unable to take responsibility for her behaviors . . . then it was pretty hard to change the behaviors . . . ." Meyers reported that Mother had not yet attended the recommended number of individual counseling sessions. Meyers concluded, "[T]here is compliance, there is good

attendance, for the most part, there is participation, but it doesn't seem to have gone to a deeper level, and I don't know how to make that happen."

¶18 Hides testified that Mother had completed some portions of her treatment plan. Mother had received a psychological evaluation, but had not followed all of the recommendations in that evaluation. Mother had remained in contact with the Department, but their communications were often volatile. Mother completed parenting education, supervised visitation, and obtained employment. Hides was still concerned, however, that Mother had made minimal progress in therapy toward being able to change her behavior. Additional witnesses testified that Mother had successfully completed two parenting education programs.

¶19 The District Court stated that the case was a difficult one because Mother had "substantially complied with her treatment plan" in many respects. The District Court found that if Mother completed counseling for the recommended period, "she may well be in a position to parent." The District Court further observed that there had been "some delay" in setting up counseling services for Mother. As a result, the District Court did not find that the condition rendering Mother unfit to parent was unlikely to change within a reasonable time. The District Court declined to terminate Mother's parental rights, allowing her additional time to complete the counseling portion of her treatment plan. On May 1, 2013, temporary legal custody was extended for six months.

¶20 The Department continued to provide Mother with services including a second psychological evaluation, therapy for J.M. to address her fears about returning to Mother's care, therapy for Mother to address past traumas and recognize safety threats to

9

her children, and increased visitation with the support of an in-home service provider. On June 16, 2013, Mother was found driving a vehicle containing marijuana, methamphetamine, and several items of paraphernalia. She was later charged with felony possession of dangerous drugs. She did not notify the Department of the charges. On August 24, 2013, the Department learned of the charges and confronted Mother. Mother denied any involvement, but tested positive for marijuana use shortly thereafter. Mother later admitted to her service providers that she was using marijuana daily for self-medication.

¶21 On September 13 and 14, 2013, Mother had a two-day supervised visit with the children. During the visit, L.M. pulled up his pant leg to show Mother a mark on his leg, saying, "Look, this is where [F.H.] hit me with the hammer!" Mother responded, "[F.H.] never hit you with a hammer." Later that day, L.M. said, "Remember when we were small and you used to put me in the dog cage?" Mother responded, "That never happened. We never had a dog." J.M. continued to exhibit sexualized behavior, which Mother ignored. At a Family Group Decision Making meeting on September 23, 2013, Mother did not acknowledge the Department's concerns about her mental health and ability to parent, stating that "everything is just fine." Mother did not attend a visit with the children scheduled for October 17 and 18, 2013, saying she was unable to take time off from work. On October 31, 2013, the Department filed a second petition for termination of Mother's parental rights.

¶22 A hearing was held on the petition beginning January 30, 2014, and continuing on February 20, 2014, and March 13, 2014. Counsel for Mother asked the court to take

10

notice of testimony presented at the previous termination hearing. Dr. Donna Veraldi testified that she had performed a psychological evaluation of Mother on July 29, 2013. Dr. Veraldi testified that Mother "didn't understand how many things you have to do to protect your children from harm." With respect to the injuries to the children, Mother "didn't know who was doing it. Either she couldn't see it, or she was in denial, or the children couldn't tell her, or she was making up excuses." Mother reported to Dr. Veraldi that she was good at managing her emotions, but Dr. Veraldi "felt that she had a lot of emotional instability, mood instability." Mother was "motivated to present an unrealistically positive image of herself" and dealt with her problems through avoidance and denial. Dr. Veraldi concluded, "And when she is so defensive and doesn't seem to have a lot of insight about what was done to her children, you get really concerned about her being able to protect her children in the future but also help her children heal from the damage of being in the situation."

¶23 Meyers testified that Mother's attendance at therapy was inconsistent. Of 53 sessions made available, Mother attended 34. Like Dr. Veraldi, Meyers testified that Mother's self-reports were positive, but "information that I was receiving from caseworkers . . . was kind of conflicting, that there were anger outbursts and inappropriate conflict." Mother stopped attending therapy sessions when she told Meyers "that she felt she was done with counseling, and she had met her treatment goals." Meyers testified that during their sessions, however, "there was still no acknowledgment of any of the abuse . . . towards her children, even as we tried to look at [the] kids' perception of the abuse, rather than whether it actually happened." Mother believed that

11

no abuse had occurred, but that the children had been persuaded—perhaps by the Department or their foster parents—to claim they had been abused.

¶24 Additional testimony was heard from Hides, Drs. Garver and Day, Detectives Tom Lynch and Derek Mahlum, visitation supervisor Jill Miller, and caseworker Randi Rains. J.M. also testified in camera. At the conclusion of the hearing, the District Court observed that

> the most important goal of the treatment plan . . . was that of the Mother's ability to come to terms with the needs of her children, to make any acknowledgment that the children had suffered as a result of their allegations of sexual abuse, emotional abuse, viewing domestic violence, and being the subject of violence themselves . . . .

The District Court stated that despite giving Mother "every benefit of every doubt" at the April 4, 2013 hearing, Mother had since proven "unable and unwilling to internalize the counseling that she has received in order to understand the needs of her children, acknowledge the fact that these children have been sexually abused, they have been physically abused, they did witness domestic violence." The District Court terminated Mother's parental rights on the grounds that Mother had not successfully completed her treatment plan and the condition rendering her unfit to parent was unlikely to change within a reasonable time.

## STANDARDS OF REVIEW

¶25 We review a district court's decision to terminate parental rights for abuse of discretion. *In re D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691. Findings of fact are reviewed for clear error and conclusions of law are reviewed for correctness. *In re K.J.B.*, 2007 MT 216, ¶ 23, 339 Mont. 28, 168 P.3d 629. A parent's right to the care

12

and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures. *D.B.*, ¶ 17. "We will not reverse a district court's ruling by reason of an error that 'would have no significant impact upon the result.'" *In re H.T.*, 2015 MT 41, ¶ 10, 378 Mont. 206, ___ P.3d ___ (quoting *In re J.C.*, 2008 MT 127, ¶ 43, 343 Mont. 30, 183 P.3d 22).

## DISCUSSION

¶26    *1. Whether Mother's due process rights were violated by delays in holding the show cause, adjudicatory, and dispositional hearings.*

¶27    A show cause hearing must be held within 20 days of the filing of an initial child abuse and neglect petition, unless otherwise stipulated by the parties or unless an extension of time is granted by the court. Section 41-3-432(1)(a), MCA; *In re L.N.*, 2014 MT 187, ¶ 15, 375 Mont. 480, 329 P.3d 598. An extension may be granted only upon a showing of "substantial injustice," and must consider the best interests of the child. Section 41-3-432(1)(c), MCA. A child may be adjudicated a youth in need of care either at the show cause hearing, by stipulation of the parties, or at a separate adjudicatory hearing held within 90 days of the show cause hearing. Sections 41-3-432(9), -434(1), -437(1), MCA. A dispositional hearing must be held within 20 days after the entry of an adjudicatory order, unless otherwise stipulated by the parties or ordered by the court. Section 41-3-438(1), MCA. The court may grant an exception to this time limit only in cases of newly discovered evidence, unavoidable delay, or unforeseen personal emergency. Section 41-3-438(1), MCA. If the applicable time

13

limitations are not met, the court must order an appropriate remedy that considers the best interests of the child. Section 41-3-438(7), MCA.

¶28 Although we have often stated that statutory procedures must be strictly observed in cases involving abused and neglected children, we have also held that a district court may protect a child's best interests despite procedural errors. *In re F.H.*, 266 Mont. 36, 39-40, 878 P.2d 890, 892-93 (1994). This approach is consistent with the Legislature's recognition that, even when administering strict timelines, a district court must be guided by the best interests of the child and give primary consideration to those interests. Sections 41-3-432(1)(c), -438(7), MCA. Further, we have also often stated that "'we will not fault a district court for failing to address statutory deficiencies that are not brought to its attention during the proceedings because doing so would encourage litigants to withhold objections rather than raise the issues appropriately in the district court.'" *In re A.S.*, 2006 MT 281, ¶ 35, 334 Mont. 280, 146 P.3d 778 (quoting *In re Declaring A.N.W.*, 2006 MT 42, ¶ 41, 331 Mont. 208, 130 P.3d 619).

¶29 On appeal, Mother argues the District Court committed reversible error when it failed to hold a show cause hearing within 20 days of the filing of the abuse and neglect petition. The show cause hearing was initially scheduled for September 22, 2011, 38 days after the petition was filed on August 15, 2011. The show cause hearing was not actually held until December 15, 2011, four months after the petition was filed. A review of the record indicates that Mother did not object to the initial September 22, 2011 date, which was already 18 days outside the statutory timeframe. Mother did object to the Department's first motion for continuance, and the Department's second motion does not

14

indicate whether Mother was contacted; however, she did not file a separate objection, move to dismiss the petition, or raise an objection at the hearing itself. We will not fault the District Court for failing to address the alleged statutory deficiency when Mother took no action to draw the court's attention to the issue during the time the hearing was pending. *A.S.*, ¶ 35. Moreover, we will not reverse due to an error that "'would have no significant impact upon the result.'" *H.T.*, ¶ 10 (quoting *J.C.*, ¶ 43). Given that the proceedings continued for two and a half years due to several extensions of the time allowed Mother to work on her treatment plan, it appears unlikely that expediting the proceedings by approximately three months would have led to a substantially different outcome.

¶30 Mother also argues the District Court erred when it failed to hold a dispositional hearing within 20 days of the show cause hearing. The dispositional hearing was held February 9, 2012, 56 days after the combined show cause and adjudicatory hearing and 36 days after the District Court issued its written adjudicatory order. At no time while the dispositional hearing was pending or at the hearing itself did Mother raise an objection to the delay, and thus we will not fault the District Court for failing to address it. *A.S.*, ¶ 35. Mother argues, on appeal, that she was prejudiced by being forced to endure this delay before she was provided with services to begin working toward reunification. The record belies this argument; at the show cause hearing, testimony demonstrated that the Department had already contacted Mother to begin providing reunification services, she had already completed a parenting education program, and supervised visitation was already being provided.

¶31 Mother further argues that she was prejudiced by the Department's delay in arranging individual counseling services. While Mother began group work to address domestic violence in February 2012, she did not begin individual counseling until July 2012. The delay in counseling services was the primary reason cited by the District Court when it denied the Department's first petition for termination of Mother's parental rights on April 4, 2013. Mother was permitted to continue counseling for nearly an additional seven months before the Department filed its second petition for termination of parental rights on October 31, 2013. Testimony at the later termination hearing revealed that Mother continued to lack insight, deny the children's needs, and present an unrealistically positive image to her counselor. Further, Mother unilaterally decided she was done with counseling and had met her treatment goals, notwithstanding her service providers' opinions to the contrary. Despite the initial delay, Mother was provided ample opportunity to engage in counseling, with little demonstrable result. We will not reverse the order of the District Court where the record clearly demonstrates that the provision of an additional few months of counseling—which were later provided—"'would have no significant impact upon the result.'" *H.T.*, ¶ 10 (quoting *J.C.*, ¶ 43).

¶32 We take note of the District Court's observation, made October 25, 2012, that the proceeding had already been open "way, way too long," and should be progressing toward a resolution. That resolution did not come for another 16 months. Delays such as this are problematic, both for parent and child, and point to the difficulty faced by the Department in attempting to provide a parent with long-term treatment within the relatively short statutory timeframes designed to promote a child's interest in resolution

16

and permanency. The abuse in this case was severe: the children's pediatrician testified that these three children were the most deeply traumatized children he had ever seen, and despite his 20 years of experience, he doubted that he had the skills necessary to provide them with adequate care. Dependency and neglect proceedings allow the Department, guided by its legal counsel and overseen by the court, to exercise discretion in choosing how to accomplish the often competing goals of reunification, permanency, and serving the best interests of the child. When the Department chooses to provide a treatment plan in a case involving severe physical, sexual, and emotional abuse, as here, rather than proceeding under the aggravated circumstances provision of § 41-3-423(2)(a), MCA, it must be cognizant of statutory timeframes and the challenges inherent in choosing this avenue. We are not unsympathetic to the Department's dilemma in effectively assessing this delicate balance of interests. Dependency and neglect proceedings demand time and require skill, management, and oversight by all parties involved, including the court. Nevertheless, the procedural requirements of Title 41 exist to establish the outer limits of what the Legislature has deemed compatible with permanency and the best interests of the child. While exceptions to timeframes may be statutorily provided for, they are just that—exceptions—and may not become the normal course of these proceedings.

¶33 In spite of the delays in holding the show cause, adjudicatory, and dispositional hearings, we are convinced that Mother's due process rights were not violated by the efforts of the Department and court to provide her with services, a treatment plan, and time to work toward reunification with her children. Our conclusion is based on a review

17

of the record as a whole, which makes clear that Mother was provided ample opportunity to make the changes necessary to become a fit parent.

¶34   *2. Whether the District Court erred when it found that Mother failed to complete her treatment plan and the condition rendering her unfit to parent was unlikely to change within a reasonable time.*

¶35   A district court may terminate the parent-child legal relationship upon a finding established by clear and convincing evidence that the child has been adjudicated a youth in need of care, an appropriate treatment plan has not been complied with or has not been successful, and the conduct or condition of the parent rendering him or her unfit is unlikely to change within a reasonable time.  Section 41-3-609(1)(f), MCA.  A parent must fully comply with a treatment plan.  *In re J.A.B.*, 2015 MT 28, ¶ 27, 378 Mont. 119, 342 P.3d 35.  Partial or even substantial compliance is not sufficient.  *J.A.B.*, ¶ 27.  Even if a parent has completed the required tasks, a treatment plan may be considered unsuccessful if the parent has failed to accomplish the overall goals of the treatment plan.  *In re D.F.*, 2007 MT 147, ¶ 36, 337 Mont. 461, 161 P.3d 825.

¶36   In determining whether the condition of the parent is unlikely to change within a reasonable time, the court must consider the following non-exclusive factors: emotional illness, mental illness, or mental deficiency of the parent; a history of violent behavior by the parent; excessive use of drugs or alcohol by the parent; and any present judicially-ordered long-term confinement of the parent.  Section 41-3-609(2), MCA; *D.F.*, ¶ 23.  The court must enter a finding that continuation of the parent-child relationship will likely result in continued abuse and neglect, or that the condition of the parent renders him or her unfit, unable, or unwilling to provide adequate care.  Section

41-3-609(2), MCA. The court is to give primary consideration to the physical, mental, and emotional needs of the child. Section 41-3-609(3), MCA. In assessing whether a parent's condition is unlikely to change, the district court should assess a parent's past and present conduct. *In re D.H.*, 2001 MT 200, ¶ 32, 306 Mont. 278, 33 P.3d 616.

¶37 The goals of the treatment plan were, among others, "[t]o assist [Mother] in acquiring the necessary skills to provide for her children's safety, permanency, and well-being," and "[t]o instill long-term change and to provide lasting stability so that further intervention by the [Department] is no longer needed." Toward these goals, Mother was required to complete tasks including completing a psychological evaluation and following recommendations made as a result of that evaluation. Mother completed two psychological evaluations, one with Dr. Day on April 4, 2012, and the second with Dr. Veraldi on July 29, 2013. Both evaluations found that Mother had difficulty managing stress and a tendency to externalize her problems. Mother consistently had a difficult time identifying her responsibility for events in her life and ways in which she could alter her behaviors. Drs. Day and Veraldi both concluded that Mother's denial of the significant problems faced by her children impeded her ability to repair the relationship and protect her children in the future. Although Mother completed other aspects of her treatment plan, and made progress by ending her relationship with F.H., she did not successfully achieve the long-term change necessary to ensure that she would be able to provide for her children's well-being. The District Court did not err in finding that Mother failed to successfully complete her treatment plan.

19

¶38　One year and eight months passed from the time Mother began individual counseling in July 2012 until the conclusion of the second termination hearing on March 13, 2014.  Her treatment plan was in effect for two years, and earlier testimony indicated that she began participating in services even before the treatment plan was approved.  Mother was provided more than ample opportunity to make the changes necessary to become a fit parent.  Throughout this time, however, Mother continued to deny that any abuse had occurred.  When visiting the children, she continued to minimize and dismiss their reports of abuse.  Several witnesses testified that the children required extensive ongoing counseling, a need which Mother appeared not to recognize.  Instead of acknowledging even her children's perception of abuse, Mother remained steadfastly committed to a course of denial and avoidance.  The District Court appropriately considered Mother's emotional and mental condition in relation to her ability and willingness to provide the children with adequate care, and gave primary consideration to the needs of the children.  The District Court did not err in finding that Mother's condition was unlikely to change within a reasonable time.

¶39　The orders of the District Court terminating Mother's parental rights to A.H., L.M., and J.M. is affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT

20