FILED

04/21/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 25-0600

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 80

IN THE MATTER OF:

A.J.C., N.M.C., A.R.C., and S.J.C.,

　　　　Youths in Need of Care.

APPEAL FROM:　District Court of the Thirteenth Judicial District,
　　　　　　　　In and For the County of Yellowstone, Cause Nos. DN 23-216,
　　　　　　　　DN 23-217, DN 23-218, and DN 23-219
　　　　　　　　Honorable Mary Jane Knisely, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellant:

　　　　　　Daniel Eakin, Attorney at Law, Sidney, Montana

　　　　For Appellee:

　　　　　　Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
　　　　　　Attorney General, Helena, Montana

　　　　　　Scott Twito, Yellowstone County Attorney, Amanda Tiernan, Deputy
　　　　　　County Attorney, Billings, Montana

　　　　　　　　　　　　　　Submitted on Briefs:　January 21, 2026

　　　　　　　　　　　　　　　　　　Decided:　April 21, 2026

Filed:

　　　　　　　　_____
　　　　　　　　　　　　　Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 J.C. (Father) appeals the order of the Thirteenth Judicial District Court, Yellowstone County, terminating his parental rights. Father argues the District Court erroneously attributed the conduct of R.B. (Mother) to Father when it found Father subjected the children to chronic abuse or neglect and terminated his rights pursuant to §§ 41-3-609(1)(d) and 41-3-423(2)(a), MCA. Father further asserts the District Court erred in terminating his parental rights pursuant to § 41-3-609(1)(f), MCA, for his failure to comply with the court ordered treatment plan. Father alleges that the treatment plan was not appropriate and that the District Court erred in finding the conduct or condition rendering him unable to parent unlikely to change within a reasonable time. Additionally, Father argues the District Court abused its discretion by failing to consider a guardianship in lieu of terminating his parental rights. We restate the issues on appeal as follows:

1. *Whether the District Court erred in terminating Father's parental rights.*

2. *Whether the District Court erred in not considering a guardianship in lieu of terminating Father's parental rights.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 On September 1, 2023, the Department of Public Health and Human Services (Department) removed four children—A.J.C. (age 10), N.M.C. (age 7), A.R.C. (age 3), and S.J.C. (age 1)—from the care of their natural parents, Mother and Father, after receiving a report that the parents were exposing the children to domestic violence and methamphetamine use. On September 7, 2023, the Department filed petitions seeking Emergency Protective Services, Adjudication as Youth in Need of Care, and Temporary

2

Legal Custody for A.J.C., N.M.C., A.R.C., and S.J.C., supported by affidavits provided by Child Protection Specialist (CPS) Ivan Colmenero. Colmenero cited recent drug tests in which Mother and Father both tested positive for methamphetamine, a March 24, 2023 suicide attempt by Father, and a string of domestic violence incidents, including a July 5, 2023 incident in which Father was charged with strangulation of a partner or family member. Colmenero provided details about the altercations between the parents as described by the children, and instances in which Mother and Father, as well as Father's parents, were uncooperative and combative with CPS and the Department in its investigation. The District Court granted the Department Emergency Protective Services and A.J.C. and N.M.C. (the two older children) were placed in foster care with their maternal great grandparents in Billings, Montana, while A.R.C. and S.J.C. were placed in foster care with a family in Red Lodge, Montana.

¶3 On September 8, 2023, the State filed notice of Father's proposed treatment plan. The conditions for return of the children, as outlined in the plan, included: a home-like setting calm enough to allow safety service providers in and for safe activities to occur; a parent willing to cooperate with the in-home safety plan; and availability of safety activities and resources necessary to implement the in-home safety plan. As for the treatment plan's specific tasks and objectives, the plan required Father to: schedule and complete a chemical dependency evaluation and follow all recommendations; engage in random drug testing; schedule and attend ongoing chemical dependency counseling; complete a mental health evaluation and follow all recommendations; attend visits with the children; complete an anger management assessment and follow all recommendations; meet with his assigned

3

CPS worker as requested; immediately advise his CPS worker and legal counsel of his current address, phone number, and any changes in household member status; obtain and maintain appropriate, safe housing, and provide his CPS worker with evidence of such; and finally, obtain and maintain a legal source of income, and provide his CPS worker with evidence of such.

¶4 On October 6, 2023, CPS Holly Masin,[1] the family's case worker, met with Father and his attorney and discussed the plan's tasks and requirements. Masin referred Father to New Day, an adult treatment program in Billings, and an initial evaluation was scheduled for October 11, 2023. While Father attended the initial evaluation, he did not engage in further treatment or follow up with any of the evaluation's recommendations.

¶5 On December 29, 2023, the Department petitioned the District Court for a determination that reunification efforts need not be provided and to order termination of Father's and Mother's parental rights pursuant to §§ 41-3-609(1)(d) and 41-3-423(2)(a), MCA, and supported by an affidavit from CPS Masin.[2] The petition alleged that Father subjected the children to aggravated circumstances, including—but not limited to—severe neglect. Specifically, the Department cited its long history with Mother and Father, including nineteen reports received from 2005 to 2023 regarding the family. While most

---

[1] At the time, Holly Masin went by her maiden name, Holly Willson.

[2] Mother voluntarily relinquished her parental rights on March 11, 2025, and does not appeal the District Court's termination of her rights in its August 8, 2025 findings of fact, conclusions of law, and order terminating her parental rights. Accordingly, we address the facts only as they relate to Father.

of the referenced reports were based on Mother and her prior children, Father was involved in a prior substantiated report from December 31, 2021. The December 31, 2021 report followed a domestic violence incident which occurred at the family's home on December 28, 2021. The police report for the incident noted the responding officers could hear yelling from outside the home, and as the officers approached, they saw Father holding a beer as he screamed at Mother, berating her for "calling the cops." After making contact with Mother and Father, the officers found A.J.C., N.M.C., and A.R.C.[3] present in the home. The officers concluded Mother and Father needed to be separated for the evening, but when the officers relayed this to them, Father responded, "you're not kicking me out of my house," and Mother stated, "the second you leave he's going to hurt me, I just know it." Ultimately, Mother agreed to leave and take the children to stay at a nearby hotel. While Father disagreed with this plan, the officers reported that he did not present any reasonable alternative, and leaving the children with Father was unreasonable given his intoxication. Mother was still at the hotel with the children on December 31, 2021, when law enforcement was contacted about housekeepers finding a large quantity of illegal drugs on the bathroom counter in Mother's hotel room. Because the drugs were reported to be within reach of the children, hair follicle tests were performed; A.J.C., N.M.C., and A.R.C. all tested positive for methamphetamine.

¶6     Following the December 31, 2021 report, the children were removed from Mother and Father's care and the Department obtained temporary legal custody. Father and

---

[3] S.J.C. was not yet born.

Mother were provided with treatment plans and in-home services and support. Father was offered chemical dependency treatment, alcohol testing, individual counseling, and parenting classes. Though Father failed several of his initial alcohol tests, both parents eventually complied with their treatment plans, and the case was dismissed December 20, 2022, after the children transitioned home to both parents.

¶7 Regarding the current case, on April 8, 2024, Father stipulated to the Department retaining temporary legal custody and to adjudication of the children as youths in need of care. Notably, Father also stipulated to his treatment plan. The District Court set a hearing for the Department's no reunification efforts for June 3, 2024, allowing the parents time to work on their treatment plans.[4] In reference to Father's treatment plan, the court advised Father, "there's a lot of work to be done." Father, who had not engaged in drug testing since the onset of the case, blamed the testing agencies for his failure to test and claimed he "had a problem" with the past two agencies he had been referred to. The District Court informed Father that "the problem isn't the agency," reminded Father he had six weeks until the next hearing, and stated, "you see this deal, (indicating), did you have your treatment plan? Because I'll be going through all of those tasks to see what's been done." The judge proceeded to call a testing agency from the bench and arranged for Father to test that day, explaining that the court needed "a baseline" on Father's drug use given his

---

[4] After a series of continuances, the hearing regarding the Petition for Determination that Preservation and Reunification Efforts Need Not be Provided, Termination of Parental Rights, and Permanent Legal Custody and the Amended Petition for Determination that Preservation and Reunification Efforts Need Not be Provided, Termination of Parental Rights, and Permanent Legal Custody did not take place until December 16, 2024, January 24, 2025, March 11, 2025, March 13, 2025, March 14, 2025, and March 17, 2025.

ongoing failure to comply. Father's April 8, 2024 drug test was positive for methamphetamine, as was his April 24, 2024 test. Father did not engage in testing again until October 2024.

¶8 On January 23, 2025, the State filed an amended petition seeking termination of Father's parental rights pursuant to § 41-3-609(1)(f), MCA, on account of Father failing to comply with his treatment plan.

¶9 At the hearing on January 24, 2025, the District Court heard testimony from Holly Demarest, an outpatient addiction counselor who was working with Father on his chemical dependency. Demarest testified she first met with Father on May 21, 2024. Father had been referred to Demarest following his April 2024 chemical dependency evaluation[5] with Verity Seeman, who had recommended Motivational Enhancement Therapy (MET), an approach in addiction therapy recommended for those who are guarded or dishonest about their substance use. Demarest stated that after her initial meeting with Father in May, she did not see Father again until September 10, 2024. However, Demarest stated Father had been attending weekly sessions regularly since he reengaged in September.

¶10 On March 10, 2025, Mother's counsel advised the court that Mother sought to relinquish her parental rights. Father, however, advised the court of his wish to proceed with the hearing as scheduled. Additional testimony was then presented on March 11, 13, 14, and 17, 2025.

---

[5] Due to Father's failure to engage in treatment following his initial evaluation at New Day in October 2023, Father's referrals expired and a new evaluation was needed to reengage. Father also underwent an additional evaluation in September 2024 after his April 2024 evaluation expired on account of his failure to engage.

7

¶11    Verity Seeman testified regarding the chemical dependency evaluations she conducted with Father in April and September of 2024.  According to Seeman, Father admitted to heavy alcohol use and ongoing marijuana use, as well as some methamphetamine use during the year prior.  Seeman also expressed that Father was guarded about his substance use and that she suspected he was being dishonest, which was her basis for recommending MET with Demarest.

¶12    Neil Friedel, the owner of the drug testing agency Father was using, testified to Father's testing history and compliance.  Friedel testified about the two positive tests Father had in April 2024 and explained that Father did not reengage in testing until October 2, 2024, but had since tested regularly and all his subsequent tests had been negative.  Friedel, however, noted that Father had not been tested for marijuana since reengaging due to the Department generally requesting marijuana be excluded.

¶13    Wendy Bulkley with Child and Family Services testified as to her supervised visits with the family.  While Bulkley stated Father attended all 111 visits, she said he was often late, "usually somewhere between 10 and 15 minutes late."  Bulkley went on to testify that Father was attentive during visits but expressed concerns about him and Mother often bickering and making disparaging comments regarding the children's placements.  Bulkley also expressed concerns with Father's lack of boundaries, noting his conversations with A.J.C., who is autistic, would often be inappropriate, and that he would avoid disciplining the children or telling them "no."  Bulkley specifically noted a time when Father let N.M.C. pick at his ears until they bled, at which point he still let her continue to pick at them.  Based

on these concerns, Bulkley testified she was unable to recommend unsupervised parenting for Father.

¶14 CPS Emily Rath testified as to her work with the family following the children's prior removal in January 2022. According to Rath, Father exhibited diminished protective capacities regarding Mother and was unable to take accountability for his own role in exposing the children to domestic violence and substance abuse. Rath stated Father tended to minimize his alcohol use and had failed multiple alcohol tests during the course of his previous treatment plan. Rath also expressed Father had blamed Mother for the 2022 removal.

¶15 Father also testified at the hearing, providing the court with details about his relationship with Mother, his drug and alcohol use, the domestic violence incidents, and his progress with the treatment plan. Father explained he learned he was A.J.C.'s natural Father in 2015, when A.J.C. was 18 months old. Father obtained legal custody of A.J.C. pursuant to a parenting plan ordered on June 5, 2015. According to Father, the plan required that he be present with A.J.C. whenever Mother was around due to concerns that Mother would "steal" A.J.C. While Father initially denied that the plan limited Mother's contact due to safety concerns surrounding Mother's substance abuse, after reviewing the parenting plan, Father admitted it specifically required that he not allow Mother to visit A.J.C. if she was under the influence.

¶16 According to Father, Mother began staying with him and A.J.C. at his home in Casper, Wyoming, but she was arrested soon after and he did not see her again until September or October of 2016. Mother was then arrested again in early 2017 and

9

incarcerated while pregnant with N.M.C. Once Mother was released and N.M.C. was born, Father and Mother moved in with Mother's grandparents in Billings, Montana. Shortly after, Mother relapsed and was once again arrested. Mother was subsequently incarcerated for 18 months, then committed to Elkhorn Treatment Center in 2019 and Passages Pre-release Center in 2020. Mother was released from Passages in December 2020 and A.R.C. was born in August 2021. Father bought a home in Billings, added Mother to the deed, and went on to testify that everything with "[Mother] was good" during this time period, and "there was really no concerns with anything." According to Father, things did not turn bad again until S.J.C. was born in August 2022. Father, however, had to be reminded by counsel that during the time frame prior to S.J.C.'s birth, Mother relapsed twice and the children had been removed from his care after the December 29, 2021 domestic violence incident and the children's subsequent exposure to methamphetamine.

¶17 Father went on to explain that things turned "not so good" when S.J.C. was born with a cleft palate. Father admitted that, at the time, he blamed Mother and suspected she had been using during the pregnancy. Mother relapsed shortly after S.J.C. was born, and Father testified he also relapsed and began using methamphetamine sometime between S.J.C.'s birth and his suicide attempt in March 2023. Father further admitted the mental health concerns which had prompted his suicide attempt remained largely unaddressed, though he later stated he did not think he would benefit from mental health counseling.

¶18 Father was then asked about the series of domestic violence reports which occurred between May and July of 2023. Father could not recall the details and repeatedly thought the children were not home during any of the incidents, though the police reports

10

established that A.J.C. and N.M.C. were present for the May 5, 2023 incident, and that N.M.C. witnessed the July 5, 2023 incident and had even yelled at Father to stop and help Mother who had been bleeding.

¶19 In his testimony, Father blamed the children's maternal great grandmother for the Department's involvement and the children's removal. Father stated he had a disagreement with her and that "[he] truly believe[s] that this – the case and all of this – is due to the problem that [he] and [maternal grandmother] had at [his] house one day, when [he] asked her to leave, and she told [him] no." Father also continued to blame his lack of regular drug testing between September 2023 and August 2024 on the drug testing agencies, citing administrative errors, though Father admitted to actively using methamphetamine between September 2023 and April 2024. Father also informed the court he drinks in moderation and uses marijuana regularly, though he considers himself "sober," and explained neither substance impacts his ability to safely parent. When asked if he ever talked to A.J.C. about how drinking and drugs are not okay, Father stated he had not "because my kids were very sheltered and . . . there was no drug use really around them."

¶20 Regarding employment, Father acknowledged he had been largely unemployed through the pendency of the case, with the exception of a job canvassing in October 2024. Father attributed his lack of job offers to employers not being willing to work around his visitation schedule, which required him to meet with Bulkley and the children for two hours twice a week. Father further admitted to being approximately $30,000 behind on his mortgage payments.

¶21    Father went on to testify as to his recent contact with Mother. According to Father, Mother showed up at the house on February 27, 2025, around 4:30 a.m., and let herself in while he was sleeping. Father explained that while Mother did not live in the house, she was still able to enter the house because she had the code for the door's keypad lock.

¶22    Father also stated he asked Mother to remove herself from the deed to the house after she decided to relinquish her parental rights. On March 5, 2025, Mother and Father met with a notary and Mother granted the deed to Father for $400. Father testified that as long as Mother remained on the deed, he "felt like there was really no way [he] could sever ties" because the deed "allowed her access to the house basically by law whenever she wanted to." Father was asked if "the only reason why [he] couldn't leave her, [he] couldn't separate from her, [he] couldn't prioritize [his] children over her relapse and recovery cycle, was because her name was on the deed?" Father responded, "Yes." While Father acknowledged his protective capacities are diminished by his relationship with Mother, he emphasized it was "namely because her name was on the deed." However, when asked what he would do if Mother showed up at the home while the children were there now that she relinquished her rights and was no longer on the deed, Father stated, "I'd probably call the cops and go from there." When counsel followed up by asking him what he would do to protect the children while waiting for law enforcement to respond, Father stated he would "[p]ray and hope the cops got there as soon as possible."

¶23    At the close of the hearing, CPS Masin testified regarding her work with Father and his progress on the treatment plan. Masin expressed that while Father began engaging in most tasks as of September 2024, she was concerned he was using prior to that and had

12

confirmed he was lying about having administrative challenges with the testing agencies. Masin also reported Father had not completed any of the mental health counseling or parenting classes recommended in his evaluation and required by the plan. Regarding Father's employment, Masin said she informed Father that part-time employment was an option, but he nonetheless remained non-compliant through the duration of the case. Masin also stated Father failed to inform her of Mother's recent visit to the house and expressed concerns regarding Father's honesty and forthcomingness. Additionally, Masin said Father told her that he believed Mother had relinquished her rights as a ploy to change the outcome of this case, stating that if he were able to get the kids back, Mother could still come back into his life.

¶24 According to Masin, Mother's recent actions in relinquishing her rights and removing herself from the deed did not change Father's long history of failing to employ protective measures during Mother's relapses, or his inability to acknowledge the seriousness of her substance abuse and distance himself and the children from her. Masin opined Father could not adequately parent and explicitly stated it was not in the children's best interest to give Father more time to work on his ability to parent because the children needed permanency and had already been in foster care for significant portions of their lives.

¶25 The District Court terminated Father's parental rights pursuant to § 41-3-609(1)(f), MCA, on the basis that Father failed to successfully complete the appropriate court-ordered treatment plan. The District Court also terminated Father's rights pursuant

13

to §§ 41-3-609(1)(d) and 41-3-423(2)(a), MCA, on the basis that Father subjected the children to chronic abuse or neglect.

## STANDARD OF REVIEW

¶26 This Court reviews a district court's termination of parental rights for an abuse of discretion. *In re L.N.*, 2014 MT 187, ¶ 12, 375 Mont. 480, 329 P.3d 598. We will not disturb a district court's decision on appeal unless "there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *In re A.B.*, 2020 MT 64, ¶ 23, 399 Mont. 219, 460 P.3d 405 (quoting *In re D.B.*, 2012 MT 231, ¶ 17, 366 Mont. 392, 288 P.3d 160). A district court abuses its discretion if it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *In re A.B.*, ¶ 23. We review a district court's findings of fact to determine whether they are clearly erroneous. *In re A.B.*, ¶ 23. "A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces the Court a mistake was made." *In re J.B.*, 2016 MT 68, ¶ 10, 382 Mont. 48, 368 P.3d 715 (citation omitted). We review a district court's conclusions of law in a termination proceeding for correctness. *In re A.B.*, ¶ 23.

## DISCUSSION

¶27 *1. Whether the District Court erred in terminating Father's parental rights.*

¶28 Section 41-3-609(1), MCA, sets forth seven circumstances in which a district court may terminate parental rights to a non-Indian child. Where a district court relies on more than one statutory basis in terminating a parent's parental rights pursuant to § 41-3-609(1),

14

MCA, any one basis, if established by clear and convincing evidence, is sufficient to support termination. *In re S.T.*, 2008 MT 19, ¶ 15, 341 Mont. 176, 176 P.3d 1054.

¶29 Here, the District Court terminated Father's parental rights pursuant to § 41-3-609(1)(d), MCA, and pursuant to § 41-3-609(1)(f), MCA. Accordingly, we may affirm the District Court's termination on either statutory basis.

¶30 Section 41-3-609(1)(f), MCA, provides that a court may terminate parental rights to a non-Indian child adjudicated as a youth in need of care if "both of the following exist: (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time."

¶31 While Father acknowledges that he failed to comply with the court ordered treatment plan, he nonetheless asserts the District Court abused its discretion in terminating his rights because the plan was not "appropriate" and because the State failed to establish by clear and convincing evidence that the conduct or condition rendering him unfit to parent was unlikely to change within a reasonable time. Specifically, Father argues the treatment plan failed to address his status as a victim of domestic violence, as well as his mental health and suicide attempt. Additionally, Father asserts the treatment plan should have been amended to require a psychosexual exam and parenting classes, both of which—according to Father—were considerations in the District Court's termination. Father further argues additional time was needed prior to any decision on termination since Father had made noticeable progress on the plan, and thus, clear and convincing evidence did not establish the conduct or condition rendering him unfit to parent unlikely to change within

15

a reasonable time. The State, however, counters by asserting Father failed to object to the plan or any of its specific tasks and thereby waived his right to challenge the appropriateness of the plan on appeal. The State further maintains the plan was appropriate and additional time was not necessary given Father's delay in engaging with the plan.

¶32 In response, Father concedes he stipulated to the treatment plan but asserts that stipulation is not dispositive as to the issue of waiver. In support of his argument, Father quotes *In re T.N.-S.,* 2015 MT 117, 379 Mont. 60, 347 P.3d 1263, in which we stated, "In determining whether a treatment plan was appropriate, one consideration is whether the parent was represented by counsel and stipulated to the treatment plan." *See In re T.N.-S.,* ¶ 20. This statement, however, goes to "determining whether a treatment plan *was appropriate*" and not to determining whether a parent waived his right to challenge the appropriateness of the treatment plan on appeal. *In re T.N.-S.,* ¶ 20 (emphasis added); *see In re T.S.,* 2013 MT 274, ¶ 25, 372 Mont. 79, 310 P.3d 538 ("When evaluating the appropriateness of a treatment plan, we consider whether the parent was represented by counsel, whether the parent stipulated to the treatment plan, and whether or not the treatment plan takes into consideration the particular problems facing both the parent and child or children.").

¶33 Regarding the issue of waiver, it is a long held principle of this Court "that acquiescence in error takes away the right of objecting to it." *In re A.A.,* 2005 MT 119, ¶ 26, 327 Mont. 127, 112 P.3d 993 (citation omitted). In accordance with this principle, we have consistently held that a parent who fails to object to a treatment plan's goals or tasks waives the right to challenge the appropriateness of the plan on appeal. *In re C.M.,*

16

2015 MT 292, ¶ 15, 381 Mont. 230, 359 P.3d 1081; *see In re T.S.*, ¶ 27; *In re C.J.M.*, 2012 MT 137, ¶ 16, 365 Mont. 298, 280 P.3d 899; *In re C.B.*, 2014 MT 4, ¶ 16, 373 Mont. 204, 316 P.3d 177; *In re D.S.B.*, 2013 MT 113, ¶ 10, 370 Mont. 37, 300 P.3d 702.

¶34 Here, Father waived his right to challenge the appropriateness of his treatment plan on appeal by failing to object to the treatment plan or any of its tasks. Father first reviewed the treatment plan with CPS Masin in October 2023. At that time, Father signed a release of information based on the plan and its tasks, and Masin made referrals on his behalf. While Father failed to engage in the plan following his initial evaluations, he signed the plan as written and without objection on April 8, 2024. Notably, Father did not have any meaningful engagement with the plan until August 2024—nearly a year after it was first proposed and the children were removed from his care. Rather than cite the appropriateness of the treatment plan as a reason for his delay, Father admitted to actively using methamphetamine during much of this time period.

¶35 If Father found the plan ineffective, he should have objected to the plan at the onset given that all of Father's alleged concerns arose prior to him signing the plan on April 8, 2024. Accordingly, Father waived his right to challenge the appropriateness of the treatment plan.

¶36 However, to terminate parental rights pursuant to § 41-3-609(1)(f), MCA, a district court must also find the conduct or condition rendering the parent unfit, unable, or unwilling to give the child adequate parental care unlikely to change in a reasonable amount of time. *In re A.B.*, ¶ 27 (citing § 41-3-609(1)(f)(ii), MCA). In making this determination, a district court "must consider the following non-exclusive factors:

17

emotional illness, mental illness, or mental deficiency of the parent, a history of violent behavior by the parent; excessive use of drugs or alcohol by the parent; and any present judicially-ordered long-term confinement of the parent." *In re A.H.*, 2015 MT 75, ¶ 36, 378 Mont. 351, 344 P.3d 403 (citing § 41-3-609(2), MCA). "[T]he question is not merely whether a parent has made progress or would make some progress in the future, but whether the parent is likely to make enough progress within a reasonable time to overcome the circumstances rendering her unfit to parent." *In re A.B.*, ¶ 27. In assessing whether a parent's conduct or condition is unlikely to change, the district court is required to assess not only a parent's present conduct, but their past conduct as well. *In re A.H.*, ¶ 36. Since "[w]e do not have a crystal ball to look into to make this determination, [] it must, to some extent, be based on a person's past conduct." *In re A.B.*, ¶ 27 (citation omitted). However, while courts must consider the past and present conduct of the parent, "[c]hildren require a stable home and should not have to 'adjust their timelines and subordinate their needs to meet the timelines of their parents.'" *Matter of R.K.*, 2023 MT 161, ¶ 30, 413 Mont. 184, 534 P.3d 656 (quoting *In re Custody of D.A.*, 2008 MT 247, ¶ 26, 344 Mont. 513, 189 P.3d 631).

¶37 Here, the District Court considered the factors outlined by § 41-3-609(2), MCA. The court specifically cited Father's mental health and mental deficiency, finding that while Father denied needing mental health counseling, he admitted to being in a toxic relationship with Mother, "clearly show[ing] his inability to recognize how his past behaviors impacted his children and their emotional needs." Additionally, Father acknowledged in his testimony that the mental health issues prompting his suicide attempt

18

remained largely unaddressed. The District Court also considered Father's inability to appreciate the effects of both his substance use and his role in the domestic violence incidents with regard to the children and his capacity to parent. The court cited police reports establishing that Father had been intoxicated during some of the domestic violence calls and that some of the incidents had taken place in front of the children, noting Father's conflicting testimony demonstrated he was continuing to minimize his role in exposing the children to domestic violence. The District Court also referenced Father's testimony regarding sobriety; specifically, Father's statement explaining that he considered himself "sober" while still using alcohol and marijuana, and that his ability to parent was not impacted despite alcohol playing a role in some of the domestic violence incidents. The District Court cited ongoing concerns regarding Father's use of methamphetamine, including the three positive tests between September 2023 and April 2024, and statements by CPS Masin and treatment providers expressing concerns with Father downplaying his substance abuse. Additionally, the court found Father's visits still required supervision and that Father failed to obtain employment throughout the pendency of the case. Further, the court found Father failed to obtain and maintain appropriate and safe housing by continuing to allow Mother into the home, being that "her ongoing substance abuse and domestic violence continue to make the home unsafe for [the] children."

¶38 Father however argues additional time was warranted due to Mother relinquishing her parental rights and Father's "noticeable progress" on his treatment plan. It is, however, unclear what—if any—bearing the relinquishment of Mother's rights has on the conduct or conditions rendering Father unfit, unable, or unwilling to parent. Father testified that

19

when Mother relinquished her rights "she walked off - - she walked away from our life," and that Mother was subsequently removed from the deed to the house. Though these acts were undertaken by Mother, Father asserts what he claims to be a newfound protective capacity—he can now have law enforcement remove Mother from the home. This alleged change in Father's protective capacity is, however, superficial and not reflective of any meaningful change in his ability or willingness to safeguard the children. To be sure, Father testified Mother still accessed the home as recently as February 28, 2025—less than two weeks before he testified—because Father never changed the key code for the locks after she moved out—a quick and obvious precaution that was readily available to Father.

¶39 Moreover, despite the change to the deed, Father continues to disregard that it is his responsibility as caregiver to promptly remove the children from unsafe situations. Father's inability to recognize this was made clear when he was asked what actions he would take if Mother showed up at the house while the children were there and the police were on route, to which Father stated he would merely "[p]ray and hope the cops got there as soon as possible." Thus, contrary to Father's assertions, Mother's absence from the deed does not change the status of his case or underscore any progress on Father's part; rather, it demonstrates Father's ongoing lack of accountability and his persistent failure to recognize—and implement—available measures to protect the children from the violence, toxicity, and substance abuse that accompany his volatile relationship with Mother.

¶40 Accordingly, the District Court did not error in terminating Father's parental rights pursuant to § 41-3-609(1)(f), MCA. Substantial evidence supports the District Court's finding that the conduct or condition rendering Father unfit to parent was unlikely to

20

change within a reasonable time, and the court correctly concluded it would be detrimental and harmful to the children to allow Father more time to complete his treatment plan. Father admittedly did not begin engaging in his treatment plan until a year after the children's removal, and while Father asserts his "noticeable progress" warrants more time, "[c]hildren need not be left to 'twist in the wind' when their parents fail to give priority to their stability and permanency." *See In re T.S.*, ¶ 30 (citing *In re A.D.B.*, 2013 MT 167, ¶ 80, 370 Mont. 422, 305 P.3d 739). As of March 17, 2025, the final day of the hearing, the children had already been in the care and custody of the state for 564 days; most of A.R.C. and S.J.C.'s lives. Thus, the District Court did not abuse its discretion in terminating Father's parental rights pursuant to § 41-3-609(1)(f), MCA.

¶41    *2. Whether the District Court erred in not considering guardianship in lieu of terminating Father's parental rights.*

¶42    Father asserts the District Court abused its discretion by terminating his parental rights without first considering guardianship. While Father acknowledges a district court is not required to consider guardianship in lieu of termination, Father nonetheless asserts— without support—the District Court's failure to consider guardianship in this case arises to error because termination was not in the best interests of the children being that the children wished to continue their relationship with Father.[6]

---

[6] There is, however, no indication in the record that the children wish to maintain a relationship with Father. Rather, to support this assertion, Father cites testimony in which CASA presents a hypothetical, "If your children were to tell you . . . they still love you and want a relationship with you, but don't feel safe living with you, what would your response be?"

21

¶43    Section 41-3-444, MCA, provides that a "court may, *upon the petition of the department or guardian ad litem*, enter an order appointing a guardian for a child who has been placed in the temporary or permanent custody of the department . . . ." (Emphasis added.) For a court to appoint a guardian, the court must find, among other things, that the Department provided its written consent to the appointment of the guardian and that the potential guardian is committed to providing a long-term relationship with the child. Section 41-3-444(2), MCA.

¶44    As previously discussed, § 41-3-609(1), MCA, outlines the specific criteria for which a court may order termination of parental rights. Section 41-3-609(1), MCA, under which the District Court terminated Father's parental rights, does not require a court to consider other options, such as guardianship, prior to terminating parental rights. *In re E.A.T.*, 1999 MT 281, ¶ 33, 296 Mont. 535, 989 P.2d 860.

¶45    Here, the issue of guardianship was never brought before the District Court. Further, while Father asserts placement with the children's maternal great grandparents or paternal grandparents would be in the children's best interests due to the children wishing to maintain a relationship with Father, the record establishes that the maternal great grandparents were not able to provide long term care for the youngest children and that the Department opposed even temporary placement of the children with the paternal grandparents due to concerns regarding their ability to recognize the safety concerns surrounding Father. Accordingly, it was not an abuse of discretion for the District Court to terminate Father's parental rights without first considering a guardianship.

**CONCLUSION**

¶46 The District Court did not abuse its discretion in terminating Father's parental rights pursuant to § 41-3-609(1)(f), MCA. Father waived his right to challenge the appropriateness of the treatment plan by failing to object to the plan at its onset, and substantial evidence supports that the condition or conduct rendering Father unfit to parent is unlikely to change within a reasonable time. Further, the District Court did not err in terminating Father's parental rights without first considering a guardianship. We affirm.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ JIM RICE